

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SDD:AAS/DMP/ICR
F. #2015R00096

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 5, 2018

By Email

Patricia A. Sullivan
Senior U.S. Probation Officer

      Re:    United States v. Munther Omar Saleh
                Criminal Docket No. 15-393 (MKB)

Dear Ms. Sullivan:

      The government respectfully submits this response to the defendant Munther Omar Saleh's objections to the Presentence Investigation Report ("PSR") disclosed on June 27, 2017.

1. (Paragraph 4). The government agrees with the defendant that he pleaded guilty to forcibly impeding federal law enforcement officers engaged in the performance of their official duties with the intent to continue to provide material support to ISIS, in violation of 18 U.S.C. § 111(a)(1). (See Plea Tr. 30-34). In particular, the defendant pleaded guilty to a lesser-included offense that does not include as an element the use of a dangerous and deadly weapon.

2. (Paragraphs 14, 15). The government generally objects to the addition to the PSR of self-serving and uncorroborated statements of the defendant, in this instance that he was crossing the George Washington Bridge because he lacked money to pay for a public bus.

3. (Paragraph 18). The defendant requests deletion of this paragraph, which generally describes the defendant's formal study of parallel and series circuitry in school. The government does not dispute that a student colleague was the recipient of the defendant's May 7, 2015 email at issue, and that the email attached a homework assignment. Notwithstanding the defendant's claims that the communication was benign and therefore the entire paragraph should be deleted, the May 7, 2015 email reflects the defendant's development of "skills in electrical circuitry" "useful in the construction of an explosive device." (PSR ¶ 18). Indeed, the defendant sent the communication at issue on the same day that he received instructions for a pressure

cooker bomb from ISIS attack facilitator Junaid Hussain. The defendant acknowledged in his post-arrest statement that it would not be hard for him to build a pressure cooker bomb pursuant to the instructions he received from ISIS.

4. (Paragraphs 19, 22). The government disrupted the defendant's plan to conduct a terrorist attack before he obtained weapons such as assault rifles or pressure cooker bombs that have recently been used in ISIS-inspired and ISIS-directed attacks around the world. The government objects to any modification to the PSR to reflect that the defendant did not possess or acquire such items by the time of his arrest.

5. (Paragraphs 24, 28). The defendant asserts in conclusory manner that he intended to use the digital watch purchased on May 19, 2015—at the same time that he was learning how to construct a pressure cooker bomb—only "in order to tell time" and claims that he "wore it regularly." However, on May 10, 2015—three days after receiving the bomb-making instructions—the defendant viewed online advertisements in the New York City area for, among other items, the terms "watch," "casio," and "vacuum." He also viewed online advertisements in the New York City area for watches, vacuum cleaners, and lamps. A watch may serve as the timer for an explosive device, parts of a vacuum may serve as a case for an explosive device, and a lamp may supply parts used in an explosive device. Accordingly, the government objects to any revisions to Paragraphs 24 or 28.

6. (Paragraph 25). Although CC1 was a likeminded supporter of ISIS, the government is unable to prove by a preponderance of the evidence that he assisted the defendant's plan to construct an explosive device. Accordingly, the government does not object to the defendant's proposed deletion of this language from the PSR.

7. (Paragraphs 32, 35, 41). While ostensibly stating that he "agrees" with the government's description of the events of June 13, 2015, the defendant nonetheless contends that it was "highly unlikely that the agent had to 'reverse into traffic' in order to avoid an attack by Mr. Saleh." At a hearing, the agent who drove the surveillance vehicle during the morning of June 13, 2015 would testify about his reasonable fear caused by the defendant and CC1 charging at his vehicle that led him to reverse from an overpass over the highway into a multi-lane intersection with traffic lights in order to avoid an attack. Additionally, the government objects to inclusion of the defendant's false exculpatory post-arrest statements regarding the purported reasons he acquired the knife seized from him approximately a week before his arrest (for protection against thieves or unidentified assailants). Finally, the government disputes any notion that a knife with a 3-inch blade is not a dangerous weapon.

8. (Paragraphs 33, 38, 39). The defendant seeks to modify the PSR in a manner to suggest that his post-arrest statement was not voluntary. This issue has been fully briefed to the Court—which did not rule on the defendant's motion to suppress his

post-arrest statements, as the motion became mooted by his guilty plea—and the government attaches hereto a copy of the government's opposition papers which detail the numerous factual and legal flaws with the defendant's suppression arguments. The government objects to any modification of the PSR to suggest coercive conduct by the government during the post-arrest statement or to include the defendant's self-serving false exculpatory statements.

9. (Paragraphs 47, 49, 66). The defendant objects to application of the 2-level enhancement for more than minimal planning. However, as the PSR correctly notes, the defendant and his coconspirators performed various anti-surveillance maneuvers to avoid law enforcement surveillance, including driving through a parking light with the vehicle's lights off, failing to observe stop signs, and pulling over before quickly accelerating, before selecting an area where the law enforcement would have limited options for escape—an overpass over the Whitestone Expressway—to rush at the vehicle while armed with knives.

   Furthermore, when considered in the context of the defendant's ongoing communications with ISIS attack facilitators in which he repeatedly stated his intent to conduct a domestic attack, preferably on law enforcement, if unable to travel to Syria to join ISIS, as well as his ongoing discussions with coconspirators including Fareed Mumuni about the same, the defendant's acts on the morning of his arrest reflect considerable premeditation and militate against any suggestion that the confrontation was spontaneous. For example, on June 3, 2015, the defendant wrote to an ISIS attack facilitator he had previously referred to as a "mujahid" (referring to an ISIS fighter) that the defendant's coconspirators "are having high speed chases with soldiers of taghout (idolatry) confronting them face to face, and are being followed everywhere they go." The defendant continued, "Its not just one bro, its five akhs (brothers) all spread apart across newyork and newjersey, who are being followed by black cars, had physical confrontation with the feds and planed for hijrah (immigration to ISIS-controlled territory) in sha Allah (God willing). One of these dear akhs (brothers), was captured during hijrah, another decided he will become an istishhadi (martyr) in US in sha Allah (God willing), and the three others are low key people who are planning hijrah." Later, on June 9, 2015, the defendant wrote to the same individual "the brothers asked me to ask the mujahedeen (referring to ISIS fighters) of our blessed khilafah (meaning "caliphate" and referring to ISIS) two questions, if they can assist some brothers financially for hijrah, and if you akhs (brothers) know how to get to darul Islam (ISIS-controlled territory) while shaytan (devil) Feds on our backs." Similarly, the defendant wrote Mumuni the day before his arrest, "I decided to tell my parents 'i will be gone in much less than a year in sha Allah, you have two choices, either you let me go to Darul Islam or you watch me kill nonMuslims here."

   Therefore, application of the two-level enhancement is appropriate. See Guideline § 1B1.1 (application note) (defining "more than minimal planning" as "more planning

3

than is typical for commission of the offense in simple form"); United States v. Calbat, 266 F.3d 358, 364 (5th Cir. 2001) (affirming district court's application of § 2A2.2(b)(1) in a case where an intoxicated defendant struck a park ranger with his vehicle); United States v. Huie, 210 F.3d 363 (4th Cir. 2000) (per curiam) (affirming § 2A2.2(b)(1) enhancement for prisoner's premeditated attack on prison guard).

10. (Paragraph 48). The defendant argues that he simply advised Mumuni to "delay or refrain from the attack." This argument is belied by Mumuni's post-arrest statement and the messages the defendant sent to Junaid Hussain. In his post-arrest statement, Mumuni stated that he asked the defendant to determine whether it would be permissible for Mumuni to die "in the process" while fighting U.S. law enforcement on behalf of ISIS. After the defendant consulted with his contacts in ISIS, the defendant instructed Mumuni that it would be "better to stay alive," but that dying would also be permissible.

    This guidance reported by Mumuni is consistent with the defendant's exchanges with Junaid Hussain on June 1, 2015—approximately two weeks before Mumuni's attack on law enforcement. The defendant asked Hussain for help with a friend "who is planning on hitting a black cop car with a pressure cooker, the black car keeps following him, and he wants to avenge our [brothers] who have been raided and blocked from [travelling to join ISIS]." He then asked, "Is it permissible for him to do the attack and die purposely in the process?" Hussain responded affirmatively and added, "If he has no other way to fight them he can do it [die in the process]." The defendant replied, "i told him the same thing."

    Accordingly, the defendant's suggestion that he advised Mumuni to delay or refrain from the attack is factually incorrect.

11. (Paragraphs 46, 58). The defendant argues that § 2X1.1 applies for the material support charges here, as "[c]onspiracies and attempts are not covered by Guideline § 2M5.3 but by Guideline § 2X1.1," and that the base offense level for Counts 1, 2 and 3 should be 27 rather than 33 because the defendant was not involved in Mumuni's attack.

    First, the commentary to § 2M5.3 explicitly references § 2339B, which includes inchoate offense such as attempt and conspiracy. In contrast, the commentary to § 2X1.1 expressly references specific statutes (other than § 2339B) and then continues, "For additional statutory provision(s), see Appendix A (Statutory Index)." In Appendix A, a number of statutes are indexed to § 2X1.1, but not § 2339B. Moreover, the only reference in the Statutory Index under § 2339B is to § 2M5.3, indicating that § 2M5.3, both under the terms of § 2X1.1's commentary, and its own commentary, is the applicable guideline provision.

    Even assuming arguendo that § 2X1.1 applies, there would be no change to the Guidelines calculation. Under § 2X1.1, the three-level reduction does not apply

4

where "the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control." The relevant question with regard to the applicability of § 2X1.1(b)(2) is "whether the conspiracy 'ripened into a substantially completed offense' or 'came close enough to fruition.'" United States v. Downing, 297 F.3d 52, 62 (2d Cir. 2002) (quoting United States v. Amato, 46 F.3d 1255, 1262 (2d Cir. 1995)) (emphasis in original). "In most prosecutions for conspiracies . . . the substantive offense was substantially completed or was interrupted or prevented on the verge of completion by the intercession of law enforcement authorities . . . . In such cases, no reduction of the offense level is warranted. Sometimes, however, arrest occurs well before the defendant or any co-conspirator has completed the acts necessary for the substantive offense." U.S.S.G. § 2X1.1, Background.

Here, the defendant, Mumuni, and their coconspirators had been aware for weeks that they were under surveillance by law enforcement and developed a plan to attack law enforcement if they were unable to travel to Syria to join ISIS. Accordingly, the defendant and CC1 obtained knives, while Mumuni readied himself by stashing kitchen knives in his bedroom and in his car. The defendant completed the final step in their preparations by obtaining religious guidance from Junaid Hussain that it would be permissible for Mumuni to die while attacking law enforcement. The fact that the defendant's arrest occurred four days before Mumuni's attack on the FBI had no impact on the fact that the substantive offense had already been substantially completed.

Second, because the defendant was closely involved in the preparation for Mumuni's attack, including obtaining religious permission for Mumuni to die in the attack, the fact that the defendant was arrested before the attack took place does not warrant application of the lower base offense level under § 2A2.1(a). Section 2A2.1 provides that a base offense level of 33 applies for attempted murder "if the object of the offense would have constituted first degree murder" or 27 "otherwise." In turn, the commentary to § 2A2.1 defines "first degree murder" as conduct covered by 18 U.S.C. § 1111, which provides that "first degree murder" is "the unlawful killing of a human being with malice aforethought. Every murder perpetrated by . . . lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree." See United States v. Shaw, 701 F.2d 367, 392 (5th Cir. 1983) ("Section 1111 retains a common law distinction between second degree murder, which requires a killing with malice aforethought, and first degree murder, which in addition to malice aforethought requires a killing with premeditation and deliberation.").

Here, the object of Mumuni's attack would have constituted first degree murder. Mumuni acknowledged that, as part of his plan with the defendant, he had been waiting to attack members of law enforcement if they entered his house (which

happened on the day he attempted to kill an FBI agent) or stopped him in his car. The defendant's repeated counsel to the defendant to attack law enforcement, including by providing the guidance of Junaid Hussain, reflects the defendant's own malice aforethought, premeditation, and deliberation. Accordingly, the base offense level of 33 appropriately applies to the defendant's conduct.

12. (Paragraphs 60, 67). The government agrees with the Probation Department that the six-level victim related adjustment for creating serious risk of bodily injury should apply to all counts of conviction, as currently reflected in the PSR. Although the commentary to § 3A1.2(c)(1) specifies that the adjustment does not apply "if the offense guideline specifically incorporates this factor," the "only offense guideline in Chapter Two that specifically incorporates this factor is § 2A2.4 (Obstructing or Impeding Officers). As § 2A2.4 does not apply (see infra), the serious risk of bodily injury enhancement remains applicable.

13. (Paragraph 62). The government agrees with the Probation Department that the four-level role enhancement applies to Counts 1, 2, and 3(a), which pertain to the defendant's multifaceted efforts to provide material support to ISIS by, inter alia: (1) recruiting individuals to attempt to travel to Syria to join ISIS; (2) serving as the sole point of contact between ISIS attack facilitators such as Junaid Hussain and the defendant's coconspirators; and (3) coordinating domestic attacks with his coconspirators. The group of coconspirators involved five or more participants, including the defendant, Mumuni, CC1, and three coconspirators from New Jersey. Information from intercepted communications, cooperating witnesses, and the defendant's own post-arrest statement demonstrate that the defendant was, in fact, the leader and galvanizer of this group and radicalized and directed his coconspirators to take action. Indeed, in his post-arrest statement, the defendant acknowledged that he had recruited "[t]ens maybe more" individuals to support ISIS and commented on his own "radicalizing gift." (Tr. 456-57).

14. (Paragraph 65). The government agrees with the Probation Department that § 2A2.2 (aggravated assault) applies to Counts 3(b) and 4, rather than § 2A2.4 (obstructing or impeding officers). In this case, the defendant, Mumuni, and others conspired to attack members of law enforcement if unable to travel to Syria to join ISIS. The coconspirators' plans were realized in the defendant and CC1's attack of federal law enforcement on the morning of their arrest and Mumuni's attempted murder of an FBI agent on the morning of his arrest.

15. (Paragraph 69). The base offense level for Counts 3(b) and 4 is based on the conspiracy between the defendant, Mumuni, CC1, the driver of the vehicle, and at least one coconspirator from New Jersey to attack members of U.S. law enforcement. For the reasons described above, the defendant was the organizer and leader of this activity, and the activity, which included two attacks on law enforcement, was extensive.

16. (Paragraph 119). The government agrees with the defendant that the statutory maximum for Count Four is 8 years.

17. (Paragraph 120). The government agrees with the defendant that the Guideline range is 636 months.

Very truly yours,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/ Alexander A. Solomon
Alexander A. Solomon
Douglas M. Pravda
Ian C. Richardson
Assistant United States Attorneys

Enclosure

cc:    Clerk of the Court (MKB)
      Deborah Colson, Esq. (via email)