

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SDD:AAS/DMP
F. #2015R00096

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 12, 2018

<u>By ECF</u>

The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Munther Omar Saleh and Fareed Mumuni
     <u>Criminal Docket No. 15-393 (MKB)</u>

Dear Judge Brodie:

   The government respectfully submits this letter regarding sentencing of defendants Munther Omar Saleh and Fareed Mumuni, scheduled for Tuesday, February 6, 2018.

   On behalf of a foreign terrorist organization, the defendants in this case conducted separate but coordinated attacks on law enforcement in the United States while armed with knives. Saleh and a coconspirator were apprehended while charging at a law enforcement officer on a highway overpass in Queens, New York; Mumuni used a kitchen knife to repeatedly stab an agent from the Federal Bureau of Investigation ("FBI") in Staten Island, New York, before being subdued. These attacks were directed by the Islamic State of Iraq and al-Sham ("ISIS"), as Saleh was in direct communication with ISIS attack facilitators including Junaid Hussain, an ISIS recruiter located in Syria who was killed by an airstrike on August 24, 2015. Based on the gravity of this conduct and the extreme risk to public safety posed by these defendants, the government respectfully submits that the statutory maximum sentences of 53 years for Saleh and 85 years for Mumuni are appropriate in this case.

   Together with this sentencing memorandum, the government submits a declaration from Harley Elmore, who is the director of training for a tactical group associated with the United States Department of Defense that trains U.S. Army Special Forces, U.S. Navy SEALs and other military personnel in the use of and defense against edged weapons. As Elmore explains, and as the government discusses in further detail below, the knife attacks carried out by Saleh and Mumuni had the potential to cause lethal damage and in

Mumuni's attack, in particular, the victim FBI Special Agent was saved from serious injury or death by luck and the swift action of his fellow agents.[1]

I.  Background

A.  Islamic State of Iraq and al-Sham ("ISIS")

ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including the November 2015 terrorist attacks in Paris, France, and the March 2016 suicide bombings in Brussels, Belgium, among many others.  These terrorist activities are part of ISIS's broader goal of forming an Islamic state or "caliphate"[2] in Iraq and Syria.

On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq (AQI), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.  On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.  (Presentence Investigation Report, Munther Omar Saleh ("Saleh PSR") ¶¶ 7-8; Presentence Investigation Report, Fareed Mumuni ("Mumuni PSR") ¶¶ 7-8).

B.  The Investigation of Munther Omar Saleh

In early 2015, members of the Joint Terrorism Task Force ("JTTF") in New York City and Newark, New Jersey began to investigate a group of likeminded individuals who sought to provide material support to ISIS.  This group included, among others, Saleh,

---

[1]  The government expects that one or more of the victims will address the Court at sentencing.

[2]  "Caliphate" is a term used to refer to ISIS's self-proclaimed system of religious governance, with Abu Bakr al-Baghdadi as the caliphate's self-proclaimed leader.

Mumuni, and several individuals from New Jersey including the brothers Alaa Saadeh and Nader Saadeh, and Samuel Topaz.[3]  (Saleh PSR ¶ 9; Mumuni PSR ¶ 9).

The investigation determined that Saleh was the spiritual leader of this group who frequently expressed radical ideology through social media postings.  In particular, Saleh's online activities during this period demonstrated his support for ISIS.  For example, Saleh's Twitter activity suggested that al-Qaeda was becoming too moderate and praised ISIS and the caliphate ISIS had been trying to establish in Iraq and Syria.  In other tweets, Saleh praised ISIS's burning of a Jordanian air force pilot and beheading of a Japanese journalist; the Charlie Hebdo terrorist attack in Paris, France; and the terrorist attack in Garland, Texas—responsibility for which subsequently was claimed by ISIS—in which two individuals in body armor and carrying assault rifles began shooting outside a location that was hosting a cartoon contest featuring depictions of the Prophet Mohammed.[4]  (Saleh PSR ¶¶ 10, 12).

On March 23, 2015, Port Authority law enforcement officers observed Saleh crossing the George Washington Bridge on foot for the second time in two days and temporarily detained him at a Port Authority facility in New Jersey.  There, FBI agents interviewed Saleh and obtained consent to view the contents of his computer, which included a file with the partial title "lock.aqeedah of IS in N . . . ."—which appeared to be a reference to a video Saleh had tweeted about translating.  In addition, agents observed multiple files on Saleh's computer whose file names included the word "translation."  Nevertheless, in that March 23, 2015 interview, Saleh denied translating ISIS propaganda or otherwise being involved in translating materials on behalf of ISIS.  (Saleh PSR ¶¶ 14-17).

The JTTF investigation further confirmed Saleh's role in radicalizing his associates, most notably Nader Saadeh.  On or about May 5, 2015, the FBI observed Saleh and others accompany Nader Saadeh to John F. Kennedy International Airport in Queens, New York, where Nader Saadeh boarded a flight to Jordan.  Nader Saadeh intended to travel from Jordan to Syria to join ISIS.  Upon arriving in Jordan, Nader Saadeh was apprehended by Jordanian authorities.  The investigation revealed that Saleh played a critical role in providing logistical preparations for Nader Saadeh's trip to Syria via Jordan.  The logistical assistance included reaching out to ISIS facilitators located in Syria for guidance and providing Nader Saadeh with contact information to facilitate his entry from Jordan into Syria.  Notably, Saleh and Mumuni accompanied Nader Saadeh on a shopping trip to

_____

[3]      As a result of the investigation, the Saadeh brothers and Topaz were apprehended by law enforcement authorities.  They have all pleaded guilty to federal terrorism charges in the District of New Jersey.  Alaa Saadeh was sentenced to 15 years' incarceration (the prior statutory maximum for 18 U.S.C. § 2339B); Nader Saadeh and Topaz are awaiting sentencing.

[4]      The perpetrators of the Garland attack were killed by law enforcement authorities.

purchase items that would be useful in ISIS-controlled territories, such as hiking boots and a compass. (Saleh PSR ¶ 50).

In addition to encouraging his associates to travel to Syria to join ISIS, Saleh prepared to conduct a terror attack in the New York metropolitan area on behalf of ISIS. On May 7, 2015, Saleh emailed himself information regarding the construction of a pressure cooker bomb, like that used in the Boston Marathon terrorist attack in 2013. Saleh had received these instructions from Syria-based ISIS attack facilitator Junaid Hussain.[5] These instructions included lists of components that could be used to construct a pressure cooker bomb. (Saleh PSR ¶ 46; Mumuni PSR ¶ 11).

On the same date that Saleh received the bomb-making instructions, the FBI directed a confidential human source ("CHS 1") to initiate an online conversation with Saleh. During the conversation, Saleh asked CHS 1 where he/she was located. CHS 1 stated that he/she was in "dar al harb," which is a reference to the areas of the world where Islam is not the prevailing religion, and then he/she stated the "North east coast." Saleh asked whether CHS 1 was in America, and CHS 1 responded affirmatively. Saleh then stated, "Well I'm in NY and trying to do an Op."[6] Also during the conversation, Saleh asked, "[W]ho is the akh [brother] who sent you to me?" CHS 1 responded that he/she was sent to Saleh by a "brother in Dawlah [ISIS]" and indicated that he/she was not "interested in specifics" and that "[w]e can cross that bridge later." Saleh responded at approximately 12:56 p.m.:

> I understand akhi [my brother], but as the system works,
> example: abuFulan sent u, u have to tell me 'abu fulan sent me',
> i would go to abuFulan to confirm and then we can safely and
> freely, [this messaging application] is fully encrypted. . . . We
> can *talk* safely. . .

CHS 1 understood this statement to mean that Saleh was requesting that CHS 1 provide a specific person within ISIS who could serve as a reference for CHS 1 and vouch for CHS 1's affiliation with ISIS. CHS 1 provided a reference of another attack facilitator at approximately 1:02 p.m., and Saleh wrote at approximately 1:08 p.m., "Ok I'm just confirming might take some time for replies. Wait a bit in sha Allah [God willing]." Approximately two hours later, at 3:03 p.m., Saleh wrote, "Akhi [my brother] I'm very sorry, but I was ordered by dawlah [ISIS] officials not to talk to anyone until they produce an akh

---

[5]     Junaid Hussain, a British-born and English-speaking ISIS member, used messaging applications to encourage attacks in the United States and Europe against persons ISIS believed should be targeted for execution. Hussain also offered technical guidance on how to carry out attacks. On August 24, 2015, Hussain was killed in an airstrike in Raqqah, Syria, a city considered by ISIS to be its capital.

[6]     "Op" is shorthand for "operation" and likely refers to an effort to conduct a terrorist attack.

[brother] of authority to vouch for them." Saleh then ceased further contact with CHS 1. Saleh's final message indicated that he was taking direct orders from persons he believed to be ISIS officials ("dawlah officials") and that he could not communicate further with CHS 1 absent confirmation from such persons that CHS 1 himself/herself was an approved member of ISIS ("until they produce an akh of authority to vouch for them"). (Saleh PSR ¶¶ 20, 21; Mumuni PSR ¶ 10).

Continued law enforcement monitoring of Saleh's online activities and physical surveillance of Saleh established that, in the spring of 2015, Saleh was researching the construction of a destructive device as well as possible target locations. Between May 7, 2015 and June 13, 2015, Saleh searched online for potential components of an explosive device or tools for the construction of an explosive device, such as lamps, electrical cords, and vacuum cleaners. On or about May 19, 2015, law enforcement agents observed Saleh obtain a black digital wrist watch—which may serve as a timer for a destructive device[7]—at a store in Queens. (Saleh PSR ¶¶ 24, 28; Mumuni PSR ¶ 12).

In addition, during May and June 2015, Saleh conducted Internet searches for various types of weapons, including a "Service Rifle," a "Special Operations Forces combat assault rifle," a "combat" tomahawk, a "U.S. Army Ranger-series fixed blade knife," a "tactical" axe, a "Smith & Wesson Model 41 semi-automatic pistol," as well as other firearms and ammunition, knives, and a crossbow. (Saleh PSR ¶ 19).

On May 28 and 31, 2015, Saleh conducted Internet searches for various notable New York City landmarks and tourist attractions, which may have been for the purpose of assessing potential targets in New York City for a terrorist attack. This conclusion was supported by Internet research in May 2015 concerning possible targets and killing innocent people. Specifically, on May 16, 2015, Saleh researched articles on the Internet titled "What Does Islam Say About Killing an Innocent Person?" and "Does Islam really allow the killing of innocent unbelievers?" (Saleh PSR ¶¶ 26, 29; Mumuni PSR ¶ 13).

During this period, Saleh was meeting with his associates to discuss his plan to conduct a domestic terror attack. On May 12, 2015, Saleh contacted Mumuni to indicate that Saleh had money and wanted to meet that day, stating Saleh had money that "talks," possibly referring to funding for an illegal transaction. During the same communication, Saleh agreed to meet with Mumuni in Staten Island at the "same place" in front of the courthouse. Saleh then proceeded to travel to Staten Island, where Mumuni lived, by subway and ferry. During this trip, he successfully eluded FBI surveillance. (Mumuni PSR ¶ 14).

Agents observed Saleh meet with Mumuni and at least two other individuals, including Samuel Topaz, on May 31, 2015 in lower Manhattan. During this meeting, Saleh and Mumuni confirmed they wanted to conduct an "Op" on American soil if they were

---

[7] See https://qz.com/505187/terrorists-around-the-world-love-this-classic-casio-wristwatch/ (last visited Jan. 10, 2018).

unable to travel to join ISIS. In particular, Saleh and Mumuni stated they wanted to find a way to attack the White House. Once they successfully helped Topaz travel to Syria to join ISIS, Saleh and Mumuni would conduct their "Op." Saleh admitted during this meeting that he was in touch with ISIS operatives in the Middle East—persons about whom Saleh was reluctant to directly discuss with the others. (Mumuni PSR ¶ 15).

In a phone call on June 1, 2015, Saleh and coconspirator Imran Rabbani discussed Saleh's meeting with Mumuni the previous day. Rabbani asked, "How was the meeting with your guys?" After Saleh asked for clarification, Rabbani responded, "I don't know . . . . You got tea with them." After Saleh again asked for clarification, Rabbani stated, "Tea, wink, wink, tea" and added, "Your buddies, man, Staten Island." Saleh then responded, "Oh yeah, it was awesome" and added that the meeting was "motivating, it was great." (Mumuni PSR ¶ 15). The government believes that Saleh's glowing comments regarding a meeting in which he discussed conducting domestic terror attacks reflects his contemporaneous commitment to take decisive action.

Around this time, another confidential source ("CHS 2") approached Saleh. On June 11, 2015, Saleh met with CHS 2 near the World Trade Center in Manhattan, before traveling to Staten Island by ferry. As they passed the Statue of Liberty, Saleh told CHS 2 that a strong storm or blast would cause the Statue of Liberty to fall. After briefly touring Staten Island together, Saleh and CHS 2 returned to Manhattan by ferry. As they were walking in Manhattan, they observed a police officer. Saleh then remarked that he hated the police. During their conversation, Saleh also remarked that he wanted to live in Jordan, Palestine, Iraq, or Syria, but he lacked the financial means to do so. He further remarked that Iraq and Syria needed their own land for a caliphate and that people needed to stop trying to prevent a caliphate, which is good for all Muslims. Saleh then talked about watching videos of Shia Muslims executing Sunni Muslims and expressed hatred for Shia Muslims.

C.    The Arrest of Munther Omar Saleh

During the night of June 12, 2015 through the early morning of June 13, 2015, law enforcement officers performed physical surveillance on Saleh and Rabbani. Saleh and Rabbani left from a mosque in a SUV vehicle (the "SUV") driven by an associate (the "Associate"). After briefly visiting a car wash, the SUV made several anti-surveillance maneuvers, including driving at a high speed through a parking lot with the lights turned off, going through stop signs without stopping, and then quickly accelerating behind a law enforcement vehicle performing surveillance on the SUV. At approximately 4:00 a.m., the SUV stopped for a red light signal at 20th Avenue, on an overpass above the Whitestone Expressway in Queens. An unmarked FBI surveillance vehicle (the "FBI Vehicle") was trailing the SUV. (Saleh PSR ¶ 32; Mumuni PSR ¶ 16).

Saleh and Rabbani simultaneously exited the SUV and took several steps towards the FBI Vehicle, and then returned to the SUV. At the time, Saleh had an unopened folding knife in his hand, which he then placed in his pocket. Moments later, Saleh and Rabbani again exited the SUV and ran from opposite sides of the SUV towards the FBI

Vehicle. In order to evade the attackers, the driver of the FBI Vehicle had to back his car into reverse off the overpass and into the intersection immediately before the overpass, at the risk of backing his vehicle into oncoming traffic. A backup law enforcement vehicle soon arrived, and responding law enforcement officers ordered Saleh and Rabbani to the ground at gunpoint. A pat down of Rabbani revealed a Smith & Wesson tactical folding knife tucked into his waistband. As discussed in the expert report of Harley Elmore, attached hereto as Exhibit A, the Smith & Wesson folding knife contained a built-in window breaker, making it easier to gain access to the FBI Vehicle and to attack the law enforcement officer inside the vehicle. (Elmore Rep. at 17 ¶ 5). Saleh was found in possession of the same folding knife he had previously held in his hand. (Saleh PSR ¶ 32; Mumuni PSR ¶ 16). Saleh's knife was also easily concealed, designed to be opened with one hand, and had a partially serrated blade. (Elmore Rep. at 17 ¶ 5). The investigation revealed that Rabbani and Saleh acquired these knives in the days leading to the attack on the FBI Vehicle.

In his recorded post-arrest statement, and after waiving his <u>Miranda</u> rights, Saleh stated he had pledged allegiance to ISIS and was a "full-fledged" member of ISIS as soon as the caliphate had been established. Saleh considered himself as an ISIS recruiter and was told that he had a "radicalizing gift." In particular, Saleh stated that Nader Saadeh would not have attempted to travel to join ISIS "if I didn't push him over man." (Saleh Post-Arrest Tr. at 468). When asked to cooperate with law enforcement authorities, Saleh refused. He said that, "in the end . . . me and them believe the same thing. I can't go against them. That's the bottom line for me." After being asked whether he was saying he could not work against ISIS because he was a part of ISIS, Saleh stated, "Yeah, that's pretty much what it is in the end. I am ISIS." (Saleh PSR ¶¶ 33, 38; Mumuni PSR ¶ 17).

During the post-arrest interview, Saleh further stated he was talking to individuals at the highest levels of ISIS. Saleh stated he was referred to someone in charge of planning terrorist attacks for ISIS—a reference to Junaid Hussain. Hussain provided Saleh with a document with instructions for making a pressure cooker bomb. Saleh remarked that the instructions seemed "pretty doable" to him, and that as long as he had a remote detonator and fireworks, he could assemble a pressure cooker bomb "instantly." Saleh stated he was asked by the "planner" to obtain a gun and assassinate someone on ISIS's behalf. Saleh had responded that he would find someone else to do the assassination. Saleh claimed in the post-arrest interview that this was his way of saying he personally would not conduct the assassination. (Saleh PSR ¶ 39).

Saleh stated he and Mumuni had watched ISIS videos together at Mumuni's house on Staten Island. He stated that he and Mumuni planned to travel for the purpose of joining ISIS. Saleh further stated that he and Mumuni had spoken about building a pressure cooker bomb. Near the end of the interview, Saleh admitted that Mumuni had told him that he was being followed by "deep tint" (referring to law enforcement) vehicles and stated that Mumuni wanted to "hit them." Notably, the JTTF did not identify Mumuni until the day prior to Saleh's arrest, and this was Saleh's only statement during the post-arrest interview suggesting that Mumuni posed a danger to law enforcement officers. (Saleh PSR ¶¶ 33, 40). Additionally, Saleh did not inform his interviewers in his post-arrest statement that he had

provided religious guidance to Mumuni sanctioning Mumuni to die while in the process of attacking members of law enforcement, as shown by messages later found in Saleh's phone.

Saleh further admitted he had purchased a knife within the week preceding his arrest and claimed the knife was for protection. He admitted he had the knife in his balled-up hand when he and Rabbani first stepped out of the SUV. Saleh also stated that Rabbani had the Smith & Wesson knife at the time and had received training on how to "scare people with a knife." (Saleh PSR ¶ 41).

Saleh further admitted that he had translated documents for ISIS. He admitted to lying in the March 2015 interview near the George Washington Bridge when he denied having translated documents on behalf of ISIS. (Saleh PSR ¶ 42).

While being taken to court for presentment, Saleh asked an FBI agent accompanying him whether he had always wanted to be an agent. The FBI agent responded affirmatively and asked whether Saleh had ever wanted to be an agent. Saleh responded, "No." When asked to explain, Saleh responded, "You and me are on the opposite sides of the battlefield." (Saleh PSR ¶ 43).

D.    The Judicially Authorized Search of Saleh's Phone

A judicially authorized search of Saleh's phone yielded significant material corroborating Saleh's support for ISIS. For instance, documents and images found on the phone included articles about jihad and the Islamic State, an article titled "39 Ways to Serve and Participate in Jihad," issues of an ISIS publication called Dabiq Magazine, articles on the legitimacy of ISIS, an article on the Boston bombers, articles about the Garland, Texas attack, including a tweet by Junaid Hussain about the attack, and a screenshot of a graphic of radical cleric and Al Qaida in the Arabian Peninsula member Anwar al-Awlaki with quotes about jihad. (Saleh PSR ¶ 44).

Saleh's phone also contained materials relating to Saleh's plans to travel to Syria to join ISIS, to construct an explosive device, and to attack U.S. law enforcement on behalf of ISIS. For instance, the phone contained a screenshot of a tripadvisor.com itinerary and price for a flight from JFK Airport to Istanbul, Turkey, via Kiev, Ukraine; an image of Saleh's face photo-shopped onto the body of an ISIS fighter; an image of a headless Statue of Liberty holding the ISIS flag with New York City burning in the background and the words "COMING SOON"; an image of the World Trade Center burning during the attacks of September 11, 2001; images of guns, assault rifles, and other weapons; images relating to and instructions for making a pressure cooker bomb, a nail bomb, and a Molotov cocktail; instructions on how to use a cell phone as a trigger device; and images relating to al Qaeda's use of car bombs.

YouTube searches on Saleh's phone reflected his knowledge that he was being followed by law enforcement. Specifically, Saleh searched for the terms "being followed by black car," "being followed by cops," and "cops following me."

A review of communications found on Saleh's phone with Mumuni revealed messages in which Saleh stated he was "[d]isgusted of these American pigs" and "can't stand living in this city," in which Saleh and Mumuni congratulated each other on Boko Haram's declaration of allegiance to ISIS, and messages in which Saleh discussed his translation of material for ISIS: "Me and a few akhs [brothers] got really touched by the recent group of multilingual akhs to translate IS [Islamic State] releases."

The phone also contained numerous communications with Junaid Hussain. Most of the older communications from Junaid Hussain had been deleted, but it is possible to infer their content from Saleh's responses, which were found in the phone.

For example, on May 1, 2015, Saleh wrote to Junaid Hussain, "Akhi [brother], abuDujana[8] told me u can, in sha Allah, give me more details on how to make a bomb." Later that same day, Saleh wrote to Junaid Hussain, "I think I can make the bomb, put a timer on it, put it in the air force school which i am going to,[9] and get on a plane to Darul Islam [ISIS-controlled territories]."

Similarly, early during the morning of May 7, 2015, Saleh wrote a series of communications to Junaid Hussain between 6:39 a.m. and 8:54 a.m.:

> (6:39 a.m.) Akhi [brother] please instruct me on the pressure cooker bomb.
>
> (6:46 a.m.) I want to do it, but I promised an akh [brother] I would see him in the khilafah [caliphate], so I must first try to get to dawlah [ISIS] then if I'm stopped by no-fly list or if airport security think I'm suspicious or something, then in sha Allah [God willing] I'm doing istishhadi [martyrdom]. In sha Allah kheir.
>
> (7:17 a.m.) So, in sha Allah, can I get the instructions?
>
> (8:40 a.m.) Ok akhi, I will strike the kuffar [infidels] here in New York city, in sha Allah, my akh [brother][10] tried to go to

---

[8]     The government believes this is a reference to ISIS attack facilitator Reyaad Khan, whose alias is "Abu Dujana." See http://www.dailymail.co.uk/news/article-3168428/British-jihadi-posed-Ed-Balls-dreamed-Asian-Prime-Minister-killed-anti-ISIS-air-strike.html (last visited Jan. 10, 2018).

[9]     Saleh was then attending Vaugh College of Aeronautics and Technology in Queens, New York.

[10]     The government believes this is a reference to Nader Saadeh, who was arrested after arriving in Jordan from the United States on or about May 5, 2015.

> Jordan to take a bus to Darul Islam [ISIS-controlled territories],
> they captured him, only 2 days ago.
>
> (8:43 a.m.) May Allah keep him patient and protect him. . .
>
> (8:54 a.m.) Ameen ha rabb!  [O' Lord] Akhi, I do not want to be
> a bother to you, but I need the instructions to begin my planning
> and to decide the best type of approach to atk [attack]

Saleh's phone also revealed conversations between Saleh and his ISIS contacts after his communications with CHS 1.  After first hearing from CHS 1 on May 7, 2015, at approximately 3:08 p.m., Saleh wrote to Junaid Hussain in order to verify the bona fides of CHS 1.  At 3:17 p.m., Saleh asked Junaid Hussain, "Akhi, Do u know the . . . account of abu Kambozz?"  At 3:20 p.m., Saleh wrote to Junaid Hussain that "the Op I'm working on just grew, alhamdulilah [praise to God], may Allah make it successful and cause many crusader casualties."  At 3:25 p.m., Saleh wrote to Junaid Hussain, "An akh i never met before messaged me telling me abu kambozz sent him to me, i remember abu dujana[11] referred me to the akh 'abukambozz' but i couldn't add him.  I have to confirm with abukambozz before we can work any further."  At 3:42 p.m., Saleh wrote to Junaid Hussain, "I just found out its abu khaled al kambodi's old . . . account."  At 4:31 p.m., Saleh wrote to Junaid Hussain that "Our akh Abu Khalid al kambodi told me he didn't send anyone to me."

After learning that Abu Kambozz had not sent CHS 1 to him, Saleh wrote to CHS 1 at 4:46 p.m. and asked, "When was the last time u spoke to abuKambozz?  At 4:53 p.m., Saleh wrote to CHS 1, "Ok, akhi, problem is abukambozz denied sending u."  Finally at 5:03 p.m., Saleh wrote to CHS 1, "Akhi I'm very sorry but i was ordered by dawlah officials not to talk to anyone until they produce an akh of authority to vouch for them."  At 5:04 p.m., Saleh forwarded that message to Junaid Hussain to tell Hussain what he had written to CHS 1.  These communications were all found in Saleh's phone.

Also on May 7, 2015, in a communication found in his phone, Saleh wrote his ideas for attack plans to Junaid Hussain:

> (5:21 p.m.) The plan will be clearer when the other few akhs i
> have make up their minds, either to perform hijrah [migrate] or
> join me in Op, since my akh was taken by Jordanian authorities
> (may Allah protect and free him) they wanted to join me.
>
> (5:23 p.m.) But i was considering that The statue of liberty has a
> very weak point in its lower back and its tilting forward, if i can
> get a few pressure cooker bombs to hit the weak point, i think it

---

[11]     As described in footnote 8, the government believes this is a reference to ISIS attack facilitator Reyaad Khan.

will fall face down, along with the mushrikeen [those who worship one other than Allah] visiting it.

(5:25 p.m.) Or we can hit times square which would be easier, but if i can get more akhs, we can preform simultaneous attacks all around NYC.

Saleh then asked Junaid Hussain, "What would it take to make an IS wilayah [division] in America?"  After Saleh received the pressure cooker bomb instructions from Junaid Hussain, Saleh wrote, "Akhi, jazak Allah kheir [may Allah reward you with goodness], the link you gave me for the explosives is really helpful."

Communications recovered from Saleh's phone further revealed that Junaid Hussain wrote to Saleh on May 10, 2015, "We start planning inshAllah."  Saleh responded:

I have 3 more ikhwa [brothers], they wanna make hijrah [migrate], in sha Allah, i wanna see how everything works out for them first, because i take care of the hijrah process for my ikhwa, and i want this to be as big an big Op as it can be, they all Said if their hirjah fails, they wanna come perform an Op with me, we can potentially collectively carryout one huge unforgettable attack.

In later communications with Junaid Hussain, Saleh indicated that he would prefer to travel to join ISIS, but would conduct a terrorist attack if that didn't work: "Akhi, forgive me, i always wanted to reach darul Islam and do my work over there, so i want to go with my first plan, attempting hijrah, then if it doesn't work out i will perform an Op here in NY."

In a communication found in Saleh's phone, Junaid Hussain asked Saleh on May 12, 2015, "Are u close to Cali?"  Junaid Hussain indicated, "We have addresses on kuffar [nonbelievers] in cali/That need to be killed/And in new York too."  After Saleh expressed interest in the New York targets, Junaid Hussain wrote, "Akhi we can't give u addresses and then u pull out/These are high level targets akhi/We can't afford to loose the addresses/We need firm brothers that will carry out attacks over there."  Saleh indicated that he was not yet ready to personally conduct that attack and that he would find somebody to do it:

I hate to undermine true Muslim authority when Allah bestowed it upon us, alhamdulilah [praise God], but my firmness still needs work, this would need long planning, and i've been interrogated and searched randomly so i fear they might find out about it, want me to see if another akh is up to it?

After Junaid Hussain responded affirmatively, Saleh wrote, "Ok in sha Allah, i'll try to find an akh.  The following day, Saleh wrote the following messages that were recovered from his cell phone.

The ikhwa [brethren] are all in the process of making hijrah [travel to ISIS], hard to find someone who may perform the targeted atk [attack], i may do it if my hijrah [travel to ISIS] fails, in sha Allah kheir.

I'll tell u how everything turns out and what our abilities are later when everything becomes clearer, in sha Allah [God willing] akhi al kareem [my brother].

On June 1, 2015, Saleh wrote Junaid Hussain regarding whether it would be permissible for Saleh's contact to die while attacking the police with a pressure cooker bomb:

Akhi [brother] help us out, i have an akh [brother] who is planning on hitting a black car cop with a pressure cooker, the black car keeps following him, and he wants to avenge our akhs [brothers] who have been raided and blocked from hijrah [migration].

Is it permissible for him to do the attack and die purposely in the process?

Junaid Hussain responded that it would be permissible for Saleh's associate to conduct a suicide attack: "Yes akhi [brother] he can do an isthishadi [martyrdom] operation on the police akhi [brother]/If he has no other way to fight them he can do it." Saleh responded that he informed his contact of Junaid Hussain's guidance: "Alhamdulilah [praise be to God] i told him the same thing, jazak Allah kheir [may Allah reward your goodness]. Is it best if he makes a [martyrdom] video?" Junaid Hussain responded, "Yeh it's good if he makes one InshAllah/Send it to me don't make it public." Saleh agreed. Saleh's acknowledgement in these written communications with Junaid Hussain that he had passed on Junaid Hussain's guidance to conduct a suicide attack was corroborated by Saleh's guilty plea allocution in which he acknowledged advising Mumuni that it would be religiously permissible for Mumuni to attack law enforcement and die in the process, as detailed below.

Notably, the government found the following communication from Saleh to Mumuni on June 12, 2015—the day before Saleh's attack on the FBI Vehicle: "I decided to tell my parents 'i will be gone in much less than a year, in sha Allah, you have two choices, either you let me go to Darul Islam or you watch me kill nonMuslims here." (Mumuni PSR ¶ 19).

The search of Saleh's cell phone yielded other electronic communications with ISIS attack facilitators. On June 3, 2015, Saleh wrote to an ISIS attack facilitator he had previously referred to as a "mujahid" [guerilla fighter] that the defendant's coconspirators "are having high speed chases with soldiers of taghout [idolatry] confronting them face to face, and are being followed everywhere they go." Saleh continued, "Its not just one bro, its

five akhs [brothers] all spread apart across newyork and newjersey, who are being followed by black cars, had physical confrontation with the feds and planed for hijrah [migration] in sha Allah [God willing].  One of these dear akhs [brothers], was captured during hijrah, another decided he will become an istishhadi [martyr] in US in sha Allah [God willing], and the three others are low key people who are planning hijrah."  Later, on June 9, 2015, Saleh wrote to the same individual "the brothers asked me to ask the mujahedeen [guerilla fighters] of our blessed khilafah [caliphate] two questions, if they can assist some brothers financially for hijrah, and if you akhs [brothers] know how to get to darul Islam [ISIS-controlled territory] while shaytan [devil] Feds on our backs."

In summary, these communications found in Saleh's phone demonstrated that Saleh was soliciting and receiving directions from multiple ISIS attack facilitators located in Syria and that he followed these directions, both in recruiting other potential foreign fighters or domestic terrorists and in making coordination efforts to attack members of U.S. law enforcement.

E.    The Arrest of Fareed Mumuni

Following the arrests of Saleh and Rabbani, the government uncovered the electronic communications from Saleh's phone that showed that Mumuni posed a grave threat to public safety.  Accordingly, the government took action to foil any effort by Mumuni to construct a destructive device or otherwise to attack members of law enforcement.  On June 15, 2015, the government obtained a search warrant for Mumuni's residence in Staten Island and cellular telephone.  (Mumuni PSR ¶ 20).

On the morning of June 16, 2015, FBI agents went to Mumuni's home to execute the search warrant.  After the FBI agents gained entry to Mumuni's residence, Mumuni came down the stairs from the second floor and first feigned compliance with the directives of law enforcement before he charged at an agent with a kitchen knife as the agents attempted to clear the house.  While repeatedly saying words in Arabic, Mumuni stabbed one of the agents multiple times in the side before Mumuni was subdued and taken into custody.  Although the agent was wearing body armor, that armor is designed to stop bullets, not blades, and will not typically stop thrusts or stabbing attacks.  (Elmore Rep. at 14 ¶ 7).  The agent was saved from serious injury or death only by his magazine carrier, which carries spare ammunition.  The metal magazine carrier deflected and chipped the point of Mumuni's knife while he was thrusting it into the agent's side.  While agents initially attempted to subdue Mumuni to the ground, he reached for an agent's firearm and attempted to pull the trigger.  Mumuni, however, was unable to fire the weapon before FBI agents ultimately subdued him.  (Mumuni PSR ¶¶ 20, 21).

After Mumuni's arrest, Mumuni's mother consented to a search of her car, which she stated that she permitted Mumuni to use.  Inside, agents recovered a duffel bag containing another large kitchen knife.  (Mumuni PSR ¶ 22).

In his post-arrest statement, after waiving his <u>Miranda</u> rights, Mumuni stated that he and Saleh had repeatedly discussed ISIS. Mumuni admitted that he had pledged allegiance to ISIS and that he had plans to travel to ISIS-controlled territories. Mumuni stated he and Saleh were both working to raise money to travel for joining ISIS and that he had researched flights from New York to Turkey. (Mumuni PSR ¶ 23).

Mumuni admitted that he and Saleh had talked about how to make and use a bomb. Saleh told Mumuni that he knew how to make a pressure cooker bomb and that Saleh would give the bomb to Mumuni to detonate. (Mumuni PSR ¶ 24).

Mumuni stated that, if intervention by law enforcement prevented him from travelling to join ISIS, he would fight. He was aware that "you guys," referring to law enforcement, were following him "24-7." He told Saleh that he was frustrated and that "if I don't get to Islamic State then you guys try to stop me, I'm going to defend myself. I wasn't going to get taken down." Mumuni said he was willing to die fighting, that he would rather die than be arrested, and that he would be dying as a martyr for ISIS. (Mumuni PSR ¶ 25).

Mumuni informed the interviewing agents that he kept the knife used in the attack in his bedroom in case the police came to his home. He started keeping the knife in his bedroom once the police started following him. It seemed obvious to him that law enforcement was following him when "shaded black cars [were] just coming in every direction in front of my house." Mumuni stated that he also kept a knife in a duffle bag in his car to be used in the event of a car stop by law enforcement. Mumuni told investigators he knew it was law enforcement at his door on the day of his attack because nobody else similarly bangs on the door. He admitted to grabbing the knife from his bed, going down the stairs, and attacking law enforcement officers with the knife. (Mumuni PSR ¶ 26).

Mumuni stated that he and Saleh had a conversation in which they discussed from a religious perspective whether Mumuni could fight law enforcement agents and die in the process. According to Mumuni, Saleh checked with somebody else and told Mumuni it would be better for Mumuni to stay alive but that it was permissible for him to die in the process—a likely reference to Saleh's online conversations with Junaid Hussain on June 2, 2015. (Mumuni PSR ¶ 27). This statement makes clear that Saleh and Mumuni worked closely together on coordinated attack plans in support of ISIS.

F.    The Indictment

On August 10, 2015, a grand jury in the Eastern District of New York returned an indictment charging Saleh and Mumuni with conspiring and attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, conspiring to attack law enforcement officers, in violation of 18 U.S.C. § 371, and assault of a federal officer, in violation of 18 U.S.C. § 111(a)(1). Additionally, Mumuni was charged

in the same indictment with attempted murder of federal law enforcement officers, in violation of 18 U.S.C. § 1114(3).[12]

G.  The Guilty Pleas

On February 9, 2017, Mumuni pleaded guilty before Your Honor to all charges absent a plea agreement.  In relevant part, Mumuni admitted under oath that he had sought to "join ISIS and defend Islam."  He admitted that he "did deliberately and intentionally attempt to kill a law enforcement officer by [lunging] at him with a knife knowing that if I succeeded in my attempt I could kill him."  (Mumuni Plea Tr. at 25, 28).

On February 10, 2017, Saleh pleaded guilty before Your Honor to all charges absent a plea agreement.  In relevant part, Saleh admitted that he had put Nader Saadeh in touch with an "ISIS recruiter who can help him to get into Syria" from Jordan.  Saleh also admitted that Mumuni had asked Saleh "if it was religiously permissible for him to attack law enforcement officers with a dangerous weapon," and Saleh "sent him a text, telling him I believed it was permissible for him to do so."  (Saleh Plea Tr. at 27-28).  Saleh, however, did not admit that he was conducting an attack on law enforcement at the time of his arrest, but rather stated that he was simply trying to impede law enforcement from conducting surveillance of him so that he could continue with his efforts to support ISIS.

As detailed in the government's January 5, 2018 letter to the Probation Department, the government generally concurs with the Probation Department's Guidelines calculation, with the exception that the maximum statutory sentences are as follows: 85 years for Mumuni and 53 years for Saleh.  See 18 U.S.C. §§ 111(a)(1), 371, 1114(3), 2339B.  The effective Guidelines sentences for each defendant are the statutory maxima.  (Saleh PSR ¶ 120; Mumuni PSR ¶ 92).

III.  Argument

A.  Statutory Maximum Sentences Are Appropriate

In addition to the range recommended by the Guidelines, 18 U.S.C. § 3553(a) requires the Court to consider a number of factors in imposing sentence, including (among others) the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense (§ 3553(a)(2)(A)); and the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) and to protect the public from further crimes of the defendant

---

[12]     Rabbani was charged as a juvenile and subsequently transferred to adult status in a separate but related matter before the Court.  See United States v. Rabbani, 15-CR-302 (MKB).  On August 19, 2016, the Court sentenced Rabbani to 20 months' imprisonment.

(§ 3553(a)(2)(C)). While the defendants engaged in related and overlapping conduct, each must be treated individually, taking into account the 3553(a) factors.

In this case, the sentences imposed must reflect the seriousness of the defendants' conduct, deter the defendants specifically from committing further crimes, deter others from traveling to join ISIS or conducting attacks on behalf of or at the direction of ISIS, and promote respect for the law. These factors all counsel in favor of statutory maximum sentences for both defendants.

B.     <u>The Criminal Conduct Is Exceptionally Serious</u>

As shown by the facts of this case and the expert report of Harley Elmore, the conduct in this case is exceptionally serious. In brief, the defendants each carried out knife attacks that had the potential to—and in Mumuni's case, very nearly did—cause serious injury or death. The defendants each committed these knife attacks on law enforcement after being deterred by constant law enforcement surveillance from carrying out their goal of committing a deadly terrorist attack on American soil on behalf of ISIS. In addition, Saleh encouraged multiple individuals, including a juvenile, to support ISIS and either participate in the domestic terror attack or travel to Syria to wage jihad with ISIS, while Saleh and Mumuni both facilitated the travel of other coconspirators to join ISIS. Each aspect of this conduct warrants a serious sentence; taken together, the appropriate sentence is the statutory maximum for each defendant.

<u>First</u>, each defendant was responsible for a potentially lethal knife attack on law enforcement. While Saleh in particular has appeared to minimize his conduct by claiming in his plea allocution and in subsequent letters to the Court that he merely intended to determine why members of law enforcement were following him and that he intended to impede their investigation of Saleh and his coconspirators so that he could continue unimpeded his support for ISIS, the circumstances surrounding his arrest show that Saleh and Rabbani were thwarted in an attack on law enforcement while armed with dangerous weapons. Moreover, Saleh and Rabbani nearly caused vehicular homicide by causing the driver of the FBI Vehicle to reverse blindly into a multilane intersection with ramps to and from the Whitestone Expressway.

As an initial matter, the fact that Saleh and Rabbani were armed with knives and not guns does not make their conduct any less serious. Elmore explains that it is commonly accepted that a law enforcement officer must be at a distance greater than 21 feet from an assailant armed with an edged weapon such as a pocketknife to successfully defend himself or herself with a firearm. Indeed, the average assailant armed with an edged weapon can cover 21 feet of ground within 1 to 1.5 seconds, which is insufficient time for law enforcement officers to draw their weapons, aim, and fire effective shots. (Elmore Rep. at 10-11). In this regard, Elmore demonstrates that edged weapons such as knives are more dangerous than guns when an assailant is the aggressor and in close proximity of a law enforcement victim.

Here, both Saleh and Rabbani obtained their weapons in the days leading to the attack, at the same time that Saleh, Mumuni, and the other coconspirators were discussing conducting attacks on law enforcement as a way of supporting ISIS. Moreover, as Elmore explains, Rabbani's weapon, a Smith & Wesson tactical knife, had a spear point designed for thrusting attacks and a partially serrated blade effective for cutting through clothing and other fibrous materials. Notably, Rabbani's knife could be opened with one hand, making an attack faster and less telegraphic. It also contained a built-in window breaker, making it easier to gain access to the FBI Vehicle and to attack the law enforcement officer inside the vehicle. (Elmore Rep. at 17 ¶ 5). Likewise, Saleh's knife was also easily concealed, designed to be opened with one hand, and had a partially serrated blade. (Id.).

As Elmore opines, Saleh and Rabbani "obtained knives that could be easily carried, easily concealed, easily deployed and deadly in its application. [Had the] second FBI agent not been present and realized the attack was occurring the [agent] in the car would have been outnumbered and extremely vulnerable to a deadly attack." (Elmore Rep. at 17 ¶ 7). Elmore further explains that, in such an attack, Rabbani could have used the window breaker feature of his knife to break a window in the FBI Vehicle, causing

> . . . the Agent [to] be confined in a tiny space, working through the [Observation-Orientation-Decision-Action] loop based on the window stimulus. At this point he would have given away force, space and time. Some of his most vulnerable timers [targets within the circulatory and respiratory systems] and switches [nerves and connective tissue], those in the neck and upper thoracic region would have been extremely easy to access from the car window. This position would have provided the Agent with little or no possible method of defense.

(Elmore Rep. at 17 ¶ 6).

Similarly, Elmore's report illustrates the extreme dangerousness of Mumuni's attack on the FBI agent. Mumuni attacked the agent and stabbed him three times with such force that he broke the tip of his knife off, meaning "he was using enough force to do potentially lethal damage to the Agent." (Elmore Rep. at 14 ¶ 7). Mumuni's effort to stab the agent was, fortunately, foiled by the agent's magazine carrier for spare ammunition, which deflected Mumuni's stabbing motions. The magazine carrier bore "deep grooves" from the stabbing attack, reflecting the force that Mumuni was using. (Id.). Had Mumuni had more time or more training, he likely would have struck the agent in a different location, potentially causing serious damage or death. As Elmore writes, "[G]iven enough time [Mumuni] would have changed targets and began to actually stab more vital targets on the Agent, severely injuring or killing him." (Elmore Rep. at 14 ¶ 8). Moreover, Mumuni's attack did not end with the stabbing of the agent; Mumuni attempted to grab and fire one of the agent's firearms while he was being subdued.

Given both defendants' pre-planning of the separate but coordinated attacks, as manifested by their agreement to attack members of law enforcement with lethal force, the acquisition of knives by Saleh and Rabbani several days before the attack in Queens, Saleh's contact with ISIS attack facilitators such as Junaid Hussain for guidance on conducting domestic terror attacks and attacks on U.S. law enforcement, and Mumuni's preparations by secreting knives in his bedroom and in his car, Saleh and Mumuni are both responsible for each of the attacks on law enforcement. See, e.g., United States v. Parkes, 497 F.3d 220, 232 (2d Cir. 2007) (discussing coconspirator liability for murder that was a necessary or natural consequence of underlying conspiracy to rob drug dealers).

Although Saleh argued in his objections to the PSR that he is not responsible for Mumuni's attack on law enforcement, which took place several days after Saleh was arrested, Saleh, Mumuni, and their coconspirators had been aware for weeks that they were under surveillance by law enforcement, and developed a plan to attack law enforcement. Accordingly, Saleh and Rabbani obtained the knives that they used in their attack, while Mumuni readied himself by stashing kitchen knives in his bedroom and in his car in the event that law enforcement came to his home or conducted a car stop while he was driving. Saleh then obtained religious guidance from Junaid Hussain that it would be permissible for Mumuni to die while attacking law enforcement. Thus, Saleh is accountable for Mumuni's attack as well as his own.

Moreover, even though Mumuni's conduct may ostensibly appear more egregious because of the viciousness of his attack, Saleh is equally culpable. Indeed, Saleh recruited and radicalized Mumuni, Rabbani, and the New Jersey coconspirators, and later provided Mumuni with Junaid Hussain's guidance regarding the attack planning that gave Mumuni free reign to attack law enforcement cognizant that Mumuni might die in the process.

Second, as set forth in more detail above, Saleh and Mumuni are responsible for planning a domestic terror attack on American soil that was foiled only because of the extraordinary efforts of the New York JTTF. As set forth above, Saleh obtained instructions from Junaid Hussain for constructing a pressure cooker bomb, like that used in the Boston Marathon terrorist attack in 2013; told a confidential source that he wanted to conduct an "Op" in New York; searched online for potential components of an explosive device or tools for the construction of an explosive device; obtained a black digital wrist watch—which may serve as a timer for a destructive device—at a store in Queens; conducted Internet searches for various types of weapons such as guns and knives; researched various notable New York City landmarks; and researched whether Islam permitted the killing of innocent people.

Saleh then had multiple meetings with coconspirators, including Mumuni, in which they discussed conducting an attack on American soil, such as attacking the White House. As noted above, Saleh's phone contained images of potential destruction and terror, including an image of a headless Statue of Liberty holding the ISIS flag with New York City burning in the background and the words "COMING SOON" as well as images relating to and instructions for making a pressure cooker bomb, a nail bomb, and a Molotov cocktail,

and instructions on how to use a cell phone as a trigger device. While Saleh had a right to possess violent images, this Court similarly has a right and an obligation to consider them, in the context of Saleh's history and characteristics, in imposing an appropriate sentence. See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Saleh later told Junaid Hussain that he was waiting to determine whether the coconspirators were able to travel to Syria to join ISIS, because if they were unable to travel—for example, if they were on a no-fly list—then they would instead help Saleh and Mumuni conduct the terror attack on American soil. Saleh told Junaid Hussain that he was thinking of attacking the Statue of Liberty or Times Square, or if his coconspirators were able to participate in the attack, conducting coordinated attacks across New York City.

Likewise, Mumuni admitted in his post-arrest statement that he had discussed with Saleh committing a domestic terrorist attack. Mumuni stated that Saleh told Mumuni that he knew how to make a pressure cooker bomb and that Saleh would give the bomb to Mumuni to detonate.

The defendants' efforts to conduct this type of terror attack on American soil were thwarted by the constant law enforcement surveillance, which prevented them from carrying out the attack.

Third, both defendants are also responsible for extremely serious conduct in facilitating the travel of New Jersey coconspirator Nader Saadeh from the United States to Jordan, where he sought to reach Syria to wage jihad on behalf of ISIS, as well as the travel of other coconspirators to attempt to join ISIS. Indeed, as noted above, Saleh admitted in his post-arrest statement that Nader Saadeh would not have traveled to join ISIS but for Saleh's recruitment efforts. Accordingly, Saleh and Mumuni's actions demonstrate the intent to send personnel to join a foreign terrorist organization and to wage violent jihad on behalf of the foreign terrorist organization. Moreover, Saleh bears additional responsibility for recruiting numerous persons to support ISIS—by his own count in his post-arrest statement, Saleh recruited "way more than tens" of persons to support ISIS (Saleh Post-Arrest Tr. at 457)—including the New Jersey coconspirators, Rabbani, and Mumuni. Saleh's communications with Junaid Hussain and other ISIS attack facilitators show that he sought to send these radicalized individuals either to wage violent jihad in Syria or to conduct terrorist attacks on U.S. soil.

All of this conduct is extremely serious on its own, and collectively, warrants a maximum sentence because of the seriousness of the conduct and also to incapacitate the defendants—and others who might consider engaging in similar acts—from ever carrying out terrorist acts in the future.

C.    Significant Sentences Are Warranted for General and Specific Deterrence

The sentences in this case should be sufficiently serious to deter the defendants from committing future crimes, as well as deter others contemplating similar criminal conduct from joining a foreign terrorist organization to wage violent jihad or from conducting attacks in the United States on behalf of or at the direction of a foreign terrorist organization.

Indeed, the need for deterrence is especially important in the context of a terrorism offense.  Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult.  See, e.g., United States v. Meskini, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").  As Second Circuit Judge John M. Walker has stated, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."  United States v. Stewart, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring).  In this case, there is a strong demand for both individual and general deterrence.

With respect to individual deterrence, each defendant has demonstrated a deeply vested commitment to violent jihad.  Saleh, as noted, recruited numerous individuals to support terrorism, including by traveling to fight on behalf of a foreign terrorist organization and by conducting a domestic attack on law enforcement in the United States.  Saleh also appeared to minimize his own conduct charging at a law enforcement officer, when he characterized as merely trying to scare off law enforcement from continuing to surveil him.  Moreover, the end result of that supposed "scaring off" was so that Saleh could work unimpeded to further the cause of jihad.  Likewise, Mumuni expressed his willingness to die in an attack in the United States, and at his plea allocution characterized his support of ISIS as defending Islam.  (Mumuni Plea Tr. at 25, 26).  In light of these facts, the Court must also give serious consideration to the need to protect the public from further crimes of the defendants (§ 3553(a)(2)(C)).  The government respectfully submits that this factor, when considered together with the seriousness of the defendants' conduct, warrants imposition of statutory maximum sentences of 53 and 85 years respectively.

The Guidelines themselves show that the imposition of statutory maximum sentences (which are also the effective Guidelines sentences) in this case would be appropriate for deterrence purposes, by enhancing the defendants' criminal history category by 12 levels for a crime of terrorism and by placing the defendants in Criminal History Category VI.  As the Second Circuit has explained, "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."  Meskini, 319 F.3d at 92.  The Court continued, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  Id.

Equally important in this case is general deterrence. Simply put, the sentence imposed should send a message to all would-be terrorists that if they seek to provide material support to a foreign terrorist organization, maintain contacts with high-ranking members of such organizations, and conduct potentially lethal attacks on law enforcement in the United States, or any other type of domestic attack on behalf of a foreign terrorist organization, they will be caught, prosecuted, and then imprisoned for significant periods.

      D.      <u>Sentencing Proportionality Weighs in Favor of Significant Sentences</u>

In this case, statutory maximum sentences would be proportionate with sentences imposed for other directed actors in the United States. For example, the following relatively recent terrorism cases in this district involving plots to attack U.S. nationals or public infrastructure resulted in life sentences:

- <u>United States v. Adis Medunjanin</u>, 10 Cr. 19 (JG) (E.D.N.Y. 2012) (defendant sentenced to life imprisonment after traveling overseas and receiving training and direction from al-Qaeda and conspiring to detonate bombs on New York City subways); and

- <u>United States v. Russell Defreitas, Abdul Kadir and Kareem Ibrahim</u>, 07 Cr. 543 (DLI) (E.D.N.Y. 2011) (all three defendants sentenced to life imprisonment for their roles in a plot to destroy infrastructure at John F. Kennedy International Airport).

Notably, the bombings of the New York City subway and JFK Airport were unconsummated. Unlike these other sentenced terrorists, however, the defendants in this case carried out actual attacks.

Additionally, in the following cases, courts imposed life sentences on terrorists convicted of crimes similar to the crimes of conviction in this case:

- <u>United States v. Mustafa Kamel Musta</u> ("Abu Hamza"), 04 Cr. 356 (KBF) (S.D.N.Y. 2015) (defendant who worked as al-Qaeda cleric and recruiter who facilitated hostage-taking in Yemen, sentenced to life imprisonment);

- <u>United States v. Sulaiman Abu Ghayth</u>, 98 Cr. 1023 (LAK) (S.D.N.Y. 2014) (al-Qaeda spokesperson sentenced to life for conspiring to kill Americans and conspiring to provide material support to terrorists);

- <u>United States v. Faisal Shahzad</u>, 10 Cr. 541 (MGC) (S.D.N.Y. 2010) (defendant sentenced to life imprisonment for failed attempt to bomb Times Square, New York);

- United States v. Mohammed Mansour Jabarah, 02 Cr. 1560 (BSJ) (S.D.N.Y. 2008) (defendant sentenced to life imprisonment upon a guilty plea to conspiring to bomb U.S. Embassies in Singapore and the Philippines); and

- United States v. Richard Reid, 02 Cr. 10013 (WGY) (D. Mass. 2003) (defendant sentenced to three life terms upon a guilty plea to attempting to destroy with explosives an in-flight commercial aircraft).

The Court should also consider the related cases of defendants who sought to conduct attacks during the summer of 2015 while similarly acting at the direction of Junaid Hussain. In the Western District of North Carolina, defendant Justin Sullivan agreed with Junaid Hussain to conduct attacks on behalf of ISIS. Sullivan agreed to buy an AR-15 rifle at a gun show and to shoot to death as many people as possible at a club or concert in North Carolina. After a silencer Sullivan ordered was delivered to his house and opened by his parents, Sullivan asked an undercover FBI agent to kill Sullivan's parents. When agents subsequently searched Sullivan's house, they discovered a .22 Marlin rifle loaded with 14 rounds and a travel bag containing a black ski mask and lock picking tools. Sullivan was sentenced to life imprisonment.

In the District of Massachusetts, defendants David Wright and Nicholas Rovinski conspired to conduct attacks on law enforcement. Coconspirator Usaamah Rahim communicated with Junaid Hussain about conducting a domestic attack. Following the example of the attacks in Garland, Texas, Wright identified Pamela Geller—the organizer of the Prophet Muhammad contest in Garland, Texas—as a beheading target. Wright, Rovsinki, and Rahim researched knives, saws, cutting tools, and weapons on the Internet. In May 2015, Junaid Hussain communicated instructions to Rahim concerning the murder of Geller, to occur on July 4, 2015. However, Rahim decided that he could not wait until July 4 and, during a call on June 2, 2015, told Wright that he wanted to "go after" the "boys in blue" (referring to police officers). Wright encouraged Rahim's plan to attack police and die as a martyr. Less than two hours later, Rahim was killed after lunging towards police officers and FBI agents with a large fighting knife and refusing to drop his weapon. Wright and Rovisnki were arrested soon thereafter. Rovinski pleaded guilty and cooperated with the government. After testifying at Wright's trial, which resulted in a conviction, Rovinski was sentenced to 15 years' incarceration. While the government sought life imprisonment, Wright was sentenced to 28 years' incarceration.[13]

---

[13] At his sentencing hearing, Wright claimed that he never meant any harm and that he had pretended to support ISIS to gain attention; at the time of his arrest, Wright weighed more than 500 pounds. See http://www.pantagraph.com/news/national/man-convicted-of-plotting-to-behead-blogger-to-be-sentenced/article_96f414fb-107c-53d7-a2cb-f6d4e90f81bf.html (last visited January 6, 2018).

In this case, the defendants not only helped others travel and attempt to travel to join ISIS, but also participated in coordinated but separate attacks on law enforcement. Taking these actions at the direction of ISIS attack facilitators, the defendants came extremely close to severely injuring or killing one or more FBI agents. As the sentences in the other Junaid Hussain-directed cases illustrate, in particular the Justin Sullivan matter, other federal judges have found it appropriate and necessary to impose life sentences in order to reflect the seriousness of the criminal conduct and the threat to public safety.

Few cases better illustrate the importance of providing just punishment, protecting the public, and ensuring specific and general deterrence than this one. A group of homegrown violent extremists who supported ISIS were in communication with ISIS attack facilitators and recruiters in Syria. One member of the conspiracy was apprehended in Jordan as he tried to travel to Syria to join ISIS. Other members of the group, including the two defendants in this case, were planning to kill Americans and obtained deadly weapons to carry out their attack. Both defendants participated in separate but coordinated attacks on law enforcement. But for the actions of the New York Joint Terrorism Task Force, innocent lives would likely have been lost in June 2015. The sentence imposed by the Court should send a clear and unequivocal message: if you plot to kill Americans and provide material support to ISIS, you will receive the maximum sentence available under the law.

IV.     Conclusion

        For all these reasons, the government respectfully requests that the Court sentence the defendants to statutory maximum sentences (53 years for Saleh and 85 years for Mumuni) in order to provide just punishment, protect the public, promote respect for the law, and provide adequate deterrence to others contemplating similar acts.

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney

                        By:      /s/ Alexander A. Solomon
                                Alexander A. Solomon
                                Douglas M. Pravda
                                Ian C. Richardson
                                Assistant U.S. Attorneys
                                (718) 254-7000

cc:     Clerk of the Court (MKB) (by ECF)
        Deborah Colson, Esq., counsel for defendant Saleh (by ECF)
        Anthony Ricco, Esq., counsel for defendant Mumuni (by ECF)