UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA                                    15 CR 393 (MB)

-against-

MUNTHER SALEH                                              ECF

--------------------------------------------------------x

**SENTENCING MEMORANDUM FOR MUNTHER SALEH**

Deborah Colson
Colson Law PLLC
80 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 257-6455
*Attorney for Munther Saleh*

Dated: New York, New York
        January 23, 2018

## Table of Contents

**INTRODUCTION**……………………………………………………..………. 1

**MUNTHER SALEH'S PERSONAL HISTORY AND CHARACTERISTICS**.................... 3

**NATURE AND CIRCUMSTANCES OF THE OFFENSE**……………………………. 7

    **A. ISIL's Beliefs and Practices**……………………………………………………. 7

    **B. ISIL's Use of Propaganda**………………………………………………….... 8

    **C. Mr. Saleh's Offense Conduct**……………………………………………..… 12

**A CONSIDERATION OF THE SENTENCING FACTORS WARRANTS A SENTENCE FAR BELOW THE STATUTORY MAXIMUM**……………………………………….... 17

    **A. Mr. Saleh Committed the Offense as a Teenager**………………………………... 19

    **B. Mr. Saleh's Risk of Recidivism is Low**……………………………………………… 22

    **C. A Sentence Significantly Below the Statutory Maximum is Necessary to Avoid Unwarranted Sentencing Disparities**……………………………………….....… 24

    **D. A Lengthy Sentence Will Not Promote General Deterrence**………………….…….. 28

**THE TERRORISM ENHANCEMENT SHOULD NOT APPLY**…………………….…. 29

    **A. The Terrorism Enhancement Was Not Developed Based on Empirical Evidence**... 30

    **B. Criminal History Category VI Substantially Over-Represents Mr. Saleh's Criminal History**……………………………………………………………………… 33

**THE TWENTY-YEAR STATUTORY MAXIMUM FOR COUNTS ONE AND TWO SHOULD NOT APPLY**………………………………………………………..… 36

**CONSECUTIVE SENTENCING IS INAPPROPRIATE**…………………………….…. 37

**CONCLUSION**……………………………………………………………….....… 37

i

# I.

## INTRODUCTION

Mr. Saleh has pled guilty to attempt and conspiracy to provide material support to a designated terrorist organization, conspiracy to assault federal officers, and impeding federal officers engaged in official duties. He is scheduled to be sentenced on February 6, 2018. The government requests the statutory maximum sentence of fifty-three years. We oppose the government's request and ask the Court to impose a sentence that maximizes Mr. Saleh's prospect for rehabilitation and reintegration with his family and community.

The U.S.-born child of Palestinian refugees, Mr. Saleh discovered ISIL propaganda as a college student in 2014. Nineteen years old and wrestling with identity issues, he was the perfect mark for ISIL's seductive ideology of statehood and citizenship and its proclaimed role as the defender of Syrian innocents. He was quickly drawn in. Mr. Saleh's social media postings illustrate his radicalization process and the motives and yearnings underlying his transformation, including feelings of alienation from his American peers. By the spring of 2015, Mr. Saleh had located ISIL recruiters over the internet, considered traveling to the Islamic State, and discussed the possibility of an attack here should his overseas trip fail to materialize. But he never made firm plans and changed his mind frequently, vacillating between a desire to travel immediately and pronouncements that his trip was months away, and between claims of planning an "Op" and admissions that his "firmness," or commitment, "still needs work."  Mr. Saleh was arrested in June 2015—one month following his twentieth birthday—while attempting to impede law enforcement officers conducting surveillance. At the time of his arrest, he had still not made arrangements for a trip to the IS or for a domestic terror attack.

More than two years later, Mr. Saleh is a changed man with a more nuanced understanding of ISIL and a more sophisticated and mature approach to resolving conflict. While

1

at the MDC, Mr. Saleh has stayed abreast of current events, engaged in personal reflection and religious study, and participated in multiple discussions with Dr. Stephen Xenakis, a psychiatrist and retired U.S. Army Brigadier General. His work has culminated in the realization that his "original goals were so misguided and clouded through [his] distorted view of the world." (Ex. A.) Mr. Saleh fully recognizes the severity of his conduct and is "sorry for his shameful behavior." (*Id.*)

Mr. Saleh's family has supported him throughout his incarceration. His parents and older sister visit him regularly, and they have spoken with him at length about the case. Mr. Saleh plans to live with them when he is released, and his parents are poised to assist with his continued education and search for employment. Mr. Saleh knows that he will receive additional punishment, but he is also ready and eager to make amends.

Obviously, the issue of future dangerousness is omnipresent in a case like this. A psychiatric evaluation by Dr. Xenakis, submitted under seal, observes that Mr. Saleh has no history of violence and has "undertaken a probing reconsideration of his ideals and perspectives." (Ex. H at 8.) He disavows ISIL and rejects its extremist politics and beliefs. Dr. Xenakis concludes that Mr. Saleh is a low risk for recidivism.

Attached in support of this application are:

- A letter from Mr. Saleh (Ex. A);
- A letter from Mr. Saleh's sister, Sarah Saleh (Ex. B);
- Excerpts from Mr. Saleh's postings and comments on social media (Ex. C);
- Letters from Mr. Saleh's parents (Ex. D);
- Letters from family members and friends (Ex. E);
- A letter from Imam Abu Ahmed, head Imam at the Saleh family mosque (Ex. F);
- Two photographs of Mr. Saleh (Ex. G);

- The psychiatric evaluation of Stephen Xenakis, M.D., submitted under seal (Ex. H); and
- A list of defendants who have been convicted of ISIL-related terrorism offenses, including sentences received (Ex. I).

## II.

## MUNTHER SALEH'S PERSONAL HISTORY AND CHARACTERISTICS

Mr. Saleh is the second of five children born to Omar Saleh and Maysoon Abu Farha. His parents—both Palestinian refugees—met and married in Jordan and immigrated to this country in the 1980s. From 1982 to 2015, Mr. Saleh's father managed a Met Food in Flushing, Queens. The store closed just weeks after Mr. Saleh's arrest, following which his father began work as an Uber driver. (PSR ¶ 87.) Mr. Saleh's mother has dedicated her life to raising her children, the youngest of whom still attends elementary school. (*Id.*) The Saleh family is well-known in the Flushing community and has a wide circle of supportive neighbors and friends. (Ex. E.)

Neither one of Mr. Saleh's parents is politically minded. They live by the moral code of Islam—kindness, obedience, abstinence, respect and charity. They also fervently believe in the American dream. Though they often struggle to make ends meet, they are committed to providing their children with the educational and professional opportunities they never had.

Mr. Saleh was born in Queens but raised between Jordan and the United States. His family moved to Jordan in 2002, after the September 11 attacks, and returned to the United States to live in Suffolk County in 2004. (PSR ¶ 90.) Mr. Saleh returned to Jordan with his mother and siblings in 2009, while his father remained in New York to work. (*Id.*) The family moved back to Queens in 2011. They currently reside in Flushing. (*Id.*)

To some extent, Mr. Saleh has a foot in both worlds. He is fluent in English and Arabic and has attended schools in both countries. But he has always felt more comfortable in Amman

than New York, partly because he made good friends there and enjoyed greater freedoms, including riding his bike and playing sports outdoors.

Life in New York has always been more challenging. Mr. Saleh's older sister, Sarah, describes her brother as an outcast in the New York public schools and writes that he was "constantly bullied" and "labeled as a terrorist starting at the age of 10." (Ex. B.) When Mr. Saleh lived in Suffolk County, he was one of two Muslim students at the local school, and he and the other student were treated like "garbage." (*Id.*) Sarah recalls one day in particular when a teacher called security on her brother and sent him to the principal's office because he had brought a mini tool kit to school. (*Id.*) On another occasion, Mr. Saleh came to school with a small cotton candy machine that he had constructed from a tuna fish can; some of his classmates told the teacher he had a bomb, and the school officials believed the students and "freaked out." (*Id.*)

Mr. Saleh has a seemingly insatiable appetite for knowledge and "spent hours reading about animals and astronomy at the age of 6." (Ex. B.) At the same time, however, he was merely an average student, more interested in brainstorming inventions and devising projects on his own than sitting inside a classroom. As a teenager, Mr. Saleh found comfort in computers and the internet. He researched topics of interest, including anime; used social media to keep in touch with Jordanian friends; watched comedies and cartoons; and spent hours playing Super Mario brothers and other video games. (Ex. B, D.) Sarah believes that video games allowed her brother to connect with "people around the world, who saw him for who he was and not what he was portrayed as." (Ex. B.)

Growing up, Mr. Saleh considered himself an atheist. Though his parents are observant Muslims, Mr. Saleh rarely said prayers or attended mosque. But his views changed in the twelfth

grade when he began researching various religions on the internet. Mr. Saleh read portions of the Koran and started to pray regularly. As his interest in Islam increased, Mr. Saleh also dreamed of returning to live in Jordan. His social media postings in high school reflect his fascination with Jordan and his hope for a peaceful, adult life there. During one Facebook exchange with a friend in April 2012, Mr. Saleh wrote that he could "buy some land [in Jordan], buy some sheep, open some butcher place, and live my life like that, a butcher…." (Ex. C, Facebook posting, April 26, 2012.) Several months later, on Yahoo Answers, Mr. Saleh echoed the same sentiment: "…by the time im 20, I see myself living a happy life in a small house/tent with my wife as a goat herder/shepard, just gonna raise goats in my country's Jordan and Palestine, living amongst happy Muslims who don't care about ipads, actors and the economy, im just gonna sell goats, make a good living and have free food…." (*Id.*, Yahoo Answers posting, June 2012.)

Upon graduation from high school in 2013, Mr. Saleh enrolled in the College of Staten Island ("CSI") and moved to the CSI dormitories, *see* PSR at ¶ 105, where he encountered drinking, drugs, and sex for the first time. Mr. Saleh found this setting difficult and isolated himself from his American peers. The Muslim students' association became his primary refuge. As Mr. Saleh bonded with other Muslim students, he grew increasingly religious and began attempting to persuade non-religious Muslim students to accept Islam or "revert."

Mr. Saleh left CSI at the end of his freshman year after falling behind on the tuition and boarding. He returned to his family home in Queens and found work as a courier for a small fabric company located in Manhattan. (PSR ¶ 111.) With several months of work under his belt, Mr. Saleh re-enrolled in college in January 2015. (*Id.* at ¶ 104.) He chose Vaughn because the tuition payments were lower than CSI, and the campus was a short bike ride from home. Mr.

Saleh's interest in Islam continued while at Vaughn. He prayed daily and frequently attended mosque.

Like many college students, in the years prior to his arrest, Mr. Saleh also developed an interest in politics. He learned about the civil war in Syria, and the pictures of injured and orphaned children affected him deeply. "I saw the civil war in Syria and I was moved," he explains. (Ex. A.) "I felt a connection to the people and was bothered by their suffering." (*Id.*) Mr. Saleh decided to "become an activist in the Syrian cause," but he "didn't support the oppressive Syrian government or the secular resistance." (*Id.*) Instead, he advocated a peaceful resolution to the conflict. In June 2013, on Yahoo Answers, Mr. Saleh posted the following reply to the question whether Muslims should kill "eastern brothers" and "everyone who refuses to submit to Allah":

> yo bro WHAT ARE YOU DOING?!!!!...no killing [a]nd no fighting unless they fight you, let them throw the first punch, no killing innocent civilians EVER….don't paint this image in your head that Islam is this constant struggle against kaffirs, its peaceful submittance to god and his messenger and that's all :).

(Ex. C, Yahoo Answers posting, June 2013.)

Mr. Saleh's friends and family describe him as a deeply sensitive young man. (Ex. D, E.) His concern for the Syrian people mirrored the compassion he had long expressed for the disadvantaged in New York. Abu Ahmed, the Imam at Mr. Saleh's family mosque notes that, prior to his arrest, Mr. Saleh frequently volunteered at the Masjid Center, "serving food and providing other community service as organized by the mosque." (Ex. F.) And Mr. Saleh's father, Omar Saleh, writes that, as a teenager, Mr. Saleh often met homeless people and "b[ought] them coffee and donuts with whatever money he h[ad] on him." (Ex. D.) Omar recalls one occasion in particular when it was cold outside, and Mr. Saleh noticed people who needed jackets. "[H]is mom told [him] yeh it's ok, we put some used coats on the side to give them

6

away, you can take them." (*Id.*) And "the look on this face changed, he grabbed the bag and went outside running with excitement." (*Id.*)

In 2014, after several months of studying the Syrian war, Mr. Saleh made a conscious decision to help, and he began searching for an organization that supported the oppressed. This process brought him in touch with the vast array of propaganda put out by the Islamic State of Iraq and the Levant ("ISIL"). Mr. Saleh was quickly drawn in by the group's message of nationhood and citizenship, and he came to view ISIL as the one organization that could defeat Assad. His parents counseled him against extremism. But Mr. Saleh continued his explorations nonetheless, winding his way through the echo chambers of social media and surrounding himself with equally marginalized and curious peers.

## III.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

### A.  ISIL's Beliefs and Practices

ISIL is an extremist, fundamentalist group of Sunni Muslims furthering a violent interpretation of Islam. In June 2014, the group shifted from an insurgency to a formalized organization purporting to be an Islamic "caliphate"–a theocratic pseudo-state ruled by a caliph, claiming to be a direct successor to the Prophet Mohammed.[1]

ISIL is distinct from traditional terrorist groups in that has held territory and claims to have established a state. ISIL sees itself as a worldwide organization. Its primary goal has been to expand the territory of the caliphate through aggressive jihad.[2] To achieve this, ISIL considers itself to be in a perpetual state of war. "[T]hey are deadly serious regarding the task of their

---

[1] Daniel Byman, *Understanding the Islamic State – A Review Essay,* 40 Int's Security No. 4, 136-37 (Spring 2016) (hereinafter Byman).
[2] Jonathan Spyer, *The Changing ISIS Threat,* Apr. 23, 2016, available at https://jonathanspyer.com/2016/04/23/the-changing-isis-threat/ (hereinafter Spyer).

caliphate: war against the non-Islamic world until the latter is defeated. More pragmatically, the sense of forward momentum is necessary to keep the foreign volunteers coming and the monetary contributions flowing."[3]

Now under assault from multiple national militaries, including the United States, in recent months, ISIL has lost the vast majority of its territory. The Iraqi government declared full victory over ISIL in early December 2017,[4] and U.S. officials estimate that there are fewer than 3,000 ISIL adherents remaining in Iraq and Syria.[5] But the group's "Internet presence remains strikingly robust,"[6] and "senior military commanders and counterterrorism specialists caution that the organization remains…a potent global movement through its call to arms to followers on social media."[7]

### B.  ISIL's Use of Propaganda

One of the most remarkable features of ISIL's strategic operations has been its intensive and sophisticated use of social media to recruit new members and supporters. On a variety of social media platforms, ISIL has engaged in an international propaganda campaign, featuring glossy online magazines, high production videos, and multi-lingual messages—propaganda

---

[3] Spyer.
[4] Margaret Coker and Falih Hassan, *Iraqi Prime Minister Declares Victory Over ISIL,* N.Y. Times (Dec. 9, 2017).
[5] Jim Garamone, *Iraqi, Syrian Democratic Forces Destroy ISIS' Caliphate,* Dept. of Defense (Dec. 11, 2017).
[6] Joby Warrick, *Isis's propaganda machine is thriving as the physical caliphate fades,* Washington Post (Aug. 18, 2017) (hereinafter Warrick). *See also* Margaret Coker, Eric Schmitt and Rukmini Callimachi*, With Loss of Its Caliphate, ISIS May Return to Guerrilla Roots*, N.Y. Times (Oct. 18, 2017) ("The group has also developed a powerful social media network….").
[7] Eric Schmitt, *The Hunt for ISIS Pivots to Remaining Pockets in Syria,* N.Y. Times (Dec. 24, 2017).

efforts President Obama described as "designed to target today's young people online," especially "those who may be disillusioned or wrestling with their identity."[8]

Harnessing social-media networks such as YouTube, Twitter, and Instagram, and peer-to-peer messaging apps like Surespot and Telegram, ISIL's strategy has been termed by some as "high-tech media jihad."[9] Along with its magazine, "Rumiyah" (previously "Dabiq"), ISIL has uses social media to disseminate emotional videos and images, depicting its members as dedicated and fearsome warriors and highlighting the ravages of the Syrian war. As described by William McCants, a scholar of militant Islam at the Brookings Institution, "ISIS videos have … a *Vice* feel about them: They're very visceral, very immediate. They're from the battlefield."[10]

ISIL has also made effective use of crowdsourcing. The group permits select members to form friendly relationships with Western supporters through messaging apps such as Surespot or Telegram and uses the supporters to transmit information online, "suffuse[ing] their social media networks with exclusive content, thereby creating buzz—and allowing the Islamic State to maintain a modicum of influence over its crowdsourced partners."[11]

Throughout, ISIL's propaganda campaign has proved to be remarkably successful. Jared Cohen, president of Jigsaw (Google's internal think tank), describes ISIL as "the first terrorist group to hold both physical and digital territory."[12]

---

[8] Remarks by the President in closing of the Summit on Countering Violent Extremism, Feb. 18, 2015, available at https://obamawhitehouse.archives.gov/the-press-office/2015/02/18/remarks-president-closing-summit-countering-violent-extremism.

[9] Alex Marshall, *How Isis got its anthem,* The Guardian (US edition) (Nov. 9, 2014).

[10] Emerson T. Brooking and P. W. Singer, *War Goes Viral: How social media is being weaponized across the world*, The Atlantic (November 2016) (hereinafter Brookings and Singer).

[11] Brendon Koerner, *Why ISIS Is Winning the Social Media War,* Wired (April 2016) (hereinafter Koerner).

[12] Brookings and Singer.

Recent ISIL propaganda videos have focused on terrorist attacks against the West, meant to suggest that ISIS will continue to fight even if the nature or location of the battle must change.[13] In 2014 and 2015, however, when Mr. Saleh was radicalized, ISIS marketed a different ideology—one of citizenship and statehood. Even more common than images of battle or bloodshed were "portrayals of public-works projects, economic development, and military triumphs….meant to convince prospective recruits of the veracity of the organization's core narrative: that its empire is both stable and inexorably growing."[14] "What they [we]re able to say," explains Professor John Horgan, "is 'You don't have to just hold the idea of a caliphate in your mind—this is real, this is tangible, and you can come here and flourish and bring your families.'"[15] That message was coupled with a sense of urgency and belonging. "They are very adept at targeting a young audience…'Be part of something that's bigger than yourself and be part of it now.' "[16]

Charlie Winter, a researcher at the Quilliam Foundation, analyzed the propaganda output for one month in mid-2015, immediately prior to Mr. Saleh's arrest. In just 30 days, ISIL created and disseminated 1,146 separate units of propaganda in six languages, including photo essays, videos, radio bulletins, magazines, pamphlets, and theological treatises, all "uniformly presented and incredibly well-executed, down to the finest details."[17] Along with the usual depictions of "civilian life, military pursuits, victimization, ultraviolence, instances of mercy and hints at the camaraderie IS's fighters enjoy," the postings stressed the idea of utopia: "social justice,

---

[13] Warrick.

[14] Koerner.

[15] *Id.*

[16] Scott Shane and Ben Hubbard, *ISIS Displaying a Deft Command of Varied Media,* N.Y. Times (Aug. 30, 2014).

[17] Charlie Winter, *Fishing and ultraviolence: so-called Islamic State is known for its brutality. But it's also hooking people in far subtler ways,* BBC (Oct. 6, 2015).

economy, religious 'purity' and the constant expansion of the caliphate."[18] The content was "voluminous" and "truly relentless," causing Winter to conclude that "the secret of the IS media strategy" was to "produce, produce, produce…overaw[ing] and overwhelm[ing] their adversaries while at the same time luring the curious and vulnerable."[19]

Civilian life was juxtaposed with military-themed output in a 2:1 ratio. "Photo essays depicting melon agriculture, handicrafts and industry, wildlife, cigarette confiscations and street cleaning were disseminated on an almost like-for-like basis alongside sets of images showing balaclava-wearing IS fighters firing mortars into the distance…."[20] Amid this juxtaposition of civilian and military life, the propagandists continuously played upon the victimhood narrative, "routinely parad[ing] dead or maimed children, women and old people before cameras...."[21] These images were designed to legitimize the caliphate and justify its crimes.[22]

ISIL's focus on statehood and citizenship was at the heart of its initial appeal—particularly, as President Obama noted, to disaffected and alienated Muslim youths. In his remarks at the White House Summit Meeting on Countering Violent Extremism on February 19, 2015, the President noted:

> [W]e must address the grievances that terrorists exploit, including economic grievances. As I said yesterday, poverty alone does not cause a person to become a terrorist, any more than poverty alone causes someone to become a criminal . . .
>
> But when people – especially young people – feel entirely trapped in impoverished communities, where there is no order and no path for advancement, where there are no educational opportunities, where there are no ways to support families, and no escape

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *See id.*

from injustice and the humiliations of corruption – that feeds instability and disorder, and makes those communities ripe for extremist recruitment.[23]

To young, impressionable minds experiencing alienation from the dominant culture around them, ISIL offered the possibility of identity and belonging.

### C.  Mr. Saleh's Offense Conduct

Like so many others, Mr. Saleh was seduced by ISIL's message of citizenship and its utopian portrayal of daily life in the Islamic State. He writes that he "fell in love with the IS" over the internet and became convinced it was a "beautiful" state ruled by the Koran. (Ex. A.) "I support the principles and goals of Islam. The Islamic State seemed to fit the criteria. They claimed to have established the laws of Islam, seemed to have set up an army, and also to have established a country." (*Id.*) On Twitter, in early 2015, Mr. Saleh wrote that the "Islamic State vows to equally share revenue from water, oil and other resources between all Muslims as ordered by Prophet Mohammed saw." (Ex. C, Twitter posting, Jan-Feb. 2015.) In another post, he claimed that the "Islamic State's public services [are] planting trees in streets of Wilayat al-Fourat." (*Id.*, Mar-Apr. 2015.) And in others, he noted the opening of a public library and of jewelry stores in Mosul "selling and running well." (*Id.*, Mar-Apr. 2015.)

Fairly soon, Mr. Saleh began reading ISIL's magazine, speaking with friends about the group, and tweeting his support. He knew that there were "some extreme elements among them," (Ex. A.), and re-tweeted the news of several violent ISIL attacks. At the same time, however, Mr. Saleh genuinely believed that there would be a place for all Muslims in the Islamic State,

---

[23] Remarks by the President at the Summit on Countering Violent Extremism, Feb. 19, 2015, available at https://obamawhitehouse.archives.gov/the-press-office/2015/02/19/remarks-president-summit-countering-violent-extremism-february-19-2015.

including those who did not wish to join the battlefield. He viewed his pledge of allegiance to ISIL as a religious oath to Islam and his fellow Muslims. (Ex. H at 7.)

In March 2015, Mr. Saleh was stopped while walking across the George Washington Bridge. He had spent the night with a friend in New Jersey and did not have money for public transportation back to New York. The agents who stopped Mr. Saleh took him to the FBI offices in Fort Lee for questioning. Though he was released later that day, Mr. Saleh quickly realized that he and his friends were under near-constant surveillance. Mr. Saleh and his friends discussed the surveillance at length and determined that the men following them were probably federal agents. They also concluded they were being followed because of their political and religious beliefs, and they became increasingly nervous and uncomfortable. On one occasion, a co-defendant, Imran Rabbani, called 911 to report that he was being followed. Subsequently, several police officers met with Mr. Rabbani concerning his complaint.

As the surveillance intensified, Mr. Saleh began telling friends that he no longer wanted to live in America and intended to travel to the Islamic State ("IS"). He spoke about the move in hopeful terms but never made firm plans or travel arrangements. Mr. Saleh's passport had expired several years earlier, and he did not seek to renew it. Nor did he make a sustained effort to save money for the trip. He had a part-time delivery job for a fabric company but spent most of his earnings on food, sweets, transportation, and small gifts for his mother. One day in February 2015, Mr. Saleh searched for flights to Turkey on tripadvisor.com. But he did not buy tickets and told friends that his trip was months away.

In early May 2015, Nader Saadeh, a friend of Mr. Saleh's, decided to travel to the IS on his own. Mr. Saadeh was subsisting on the verge of poverty in the United States, and his living conditions were "just plain nasty." (Ex. H at 7.) His plan was to visit with his parents in Jordan

13

before traveling through Turkey to Syria. While Mr. Saleh supported his friend's decision to travel, he did not arrange or pay for the trip. Mr. Saadeh's parents sent him money for the plane ticket, and his brother and co-defendant, Alaa, helped him to buy it. Mr. Saleh assisted in two respects: He accompanied Mr. Saadeh to buy hiking boots and gave him contact information, located online, for a purported ISIL recruiter. Mr. Saadeh never reached the Islamic State; he was arrested at the airport in Amman.

Mr. Saleh and his U.S.-based friends remained under heavy surveillance in the weeks after Mr. Saadeh's arrest. Mr. Saleh continued to talk about moving to the IS and texted an ISIL recruiter about his plan.[24] He also talked with the recruiter about the possibility of a domestic terror attack. Contrary to the government's suggestion (Gov. Sent'g Ltr at 18), however, Mr. Saleh never made a concrete plan. He did not purchase the items he viewed online[25] or attempt to obtain or construct a bomb. Moreover, within days of requesting the bomb-making instructions, Mr. Saleh hesitated and backed off. On May 11, 2015, Mr. Saleh told the recruiter that he wanted to make "hijrah" first and would perform an "Op here" only if he could not make the trip. On May 12, 2015, Mr. Saleh declined to participate in an attack altogether, stating that it "would need long planning" and that his "firmness still needs work." He told the recruiter that he would look for someone else who might be "up to it," then texted again to say that his "brothers" were all planning to travel instead. Mr. Saleh had no further communications with the recruiter for several weeks after that.

On June 1, 2015, Mr. Saleh wrote to the recruiter again to ask if it was religiously permissible for a friend to attack law enforcement. The following day, Mr. Saleh texted Mr.

---

[24] Mr. Saleh did not know that the recruiter was Junaid Hussein.
[25] Mr. Saleh did buy a watch but did not intend to use it to construct a bomb. He bought the watch in order to tell time and wore it regularly. (Ex.  G.)

Mumuni that an attack was permissible. Mr. Mumuni responded that he was on his way to work and suggested that they continue the discussion when he arrived. They did not text again about the attack.

On June 13, 2015, Mr. Saleh was arrested while impeding law enforcement officers conducting surveillance. The government's assertion that Mr. Saleh engaged in a "potentially lethal knife attack," Gov. Sent'g Ltr at 16, is a gross mischaracterization of the facts. There was no knife attack. Mr. Saleh possessed a knife, but he did not use it or even display it.[26]

Mr. Saleh and his friends had attended services at a mosque the previous night, where they participated in lengthy religious discussions. When the services finished, Mr. Saleh and some others headed by jeep to College Point. At some point, they realized that they were being followed. When their attempt to evade the pursuer failed, they decided to confront him instead. They drove onto a bridge over the Whitestone Expressway and stopped at a traffic light. Mr. Saleh and a co-defendant, Imran Rabbani, exited the jeep and approached the car behind them. When the car backed up, Mr. Saleh and Mr. Rabbani returned to the jeep. Once inside the jeep, the car behind pulled closer. Mr. Saleh and Mr. Rabbani got out of the jeep again and began running toward the car. They never reached it. Within moments, a third car arrived, and various federal agents ordered Mr. Saleh and Mr. Rabbani to stop. Neither man resisted arrest.

By Mr. Saleh's own admission, he was carrying a closed knife in his hand when he exited the car for *the first time.* But he put the knife back in his pocket when he returned to the car and kept it in his pocket when he exited the car again. Mr. Saleh did not display the knife to anyone or indicate, by word or deed, that he intended to use it. None of the law enforcement officers saw

---

[26] For this reason, per the government's consent, Mr. Saleh allocuted to a violation of 18 U.S.C. § 111(a) rather than a violation of § 111(b).

him holding a knife, and he did not have it in his hand upon arrest. It was found in his pocket during a post-arrest search.

Nor as the government suggests did Mr. Saleh and Mr. Rabbani "nearly cause vehicular homicide." (Gov. Sent'g Ltr at 16.)  The incident occurred at 4 am, when there is little, if any, traffic on the road.

Following his arrest, Mr. Saleh was transported to the FBI offices downtown and interrogated for nearly six hours. He repeatedly told the agents that he was tired and had not slept the night before,[27] and at various points, he actually closed his eyes and leaned his head on the table or against the wall. The agents continued to question Mr. Saleh even when his eyes were closed or head was down.

During the interrogation, Mr. Saleh acknowledged his support for ISIL and said that he wanted to travel to the Islamic State but had no money or firm plans. He also claimed to have radicalized "way more than tens" of people. But this was an exaggeration, and there is no evidence to support it.

Most importantly, Mr. Saleh repeatedly told the agents that he never had any intention of assembling or detonating a bomb. "There was no plan," he said. "You you're never gonna get anything out of me cause I really didn't plan on doing anything here. I was it eh I hated…that the

---

[27] *See, e.g.*, Interrogation Transcript (hereinafter Tr.) at 29 ("Oh my head's killing me . . .The lights are really bright"); *Id.* at 147 (while leaning his head against the wall: "I'm just very tired. I got . . . most of most of what's on my mind on paper."); *Id.* at 157 ("I can't go a day without sleeping"); *Id.* at 245 (with head on the table and eyes closed: "Sleep what does that feel like? . . . I miss sleeping."); *Id.* at 257-59 ("Oh, I want a bed or something . . . Daaahh my brain wants to kill me. . . . I'm tired. . . .Yeah I'm trying [it's] hard as I can"); *Id.* at 360 ("Well right now my brain is like tin foil I can't . . . ah um what are we talking about again?"); *Id.* at 381-82 ("I'm never gonna get sleep ever . . . what time's it now? . . . Can I have my jail cell just so I can sleep in it?"); *Id.* at 494 ("[W]hen can I be moved into my bed?")  A copy of the transcript was provided to the Court in connection with Mr. Saleh's motion to suppress. An additional copy is available should the Court need it.

US is bombing there and I hated like what they do there but …but I simply wouldn't have the guts or the the the movement to just like go out to bomb this place…go on the run do all that stuff…I'm not that kind a guy. I can't do it. That's it. I can't do that. Could other people do it I don't know. Would I have helped them? Probably not because then I would have to be on the run regardless…." Tr. at 351-52.[28] Notably, while Mr. Saleh was being interrogated, FBI agents searched the Saleh home and found no weapons or bomb-making materials.

Mr. Saleh's parents were shocked to learn of his behavior and ashamed of their ignorance and inability to stop him. But their love and loyalty for their son has never wavered. They visit him weekly at the MDC and exchange frequent letters. And they are not alone. Since Mr. Saleh's arrest, numerous family members and friends have rallied to his side, each of whom describes him as sociable, kind, and concerned for those less fortunate than himself. (Ex. E.)

## IV.

## A CONSIDERATION OF THE SENTENCING FACTORS WARRANTS A SENTENCE FAR BELOW THE STATUTORY MAXIMUM

In October 2002, Robert Mueller—then Director of the FBI—spoke at Stanford Law School on the subject of terrorism in a post-9/11 world. The attacks, he noted, had significantly altered how law enforcement approached terrorism investigations, and the Bureau was still wrestling with how to use its new, expanded powers. At the same time, however, Mueller cautioned that law enforcement should be mindful not to undermine the very civic virtues it

---

[28] *See id.* at 269 ("We were not planning on it. We didn't have that kind of…We're not suicide attackers…We're not that kind of people."); *Id.* at 271 ("…I'm I'm I don't wanna do that. I don't want a gun. It's not my style."); *Id.* at 279 ("…no because because they they sent you things like like how how would you  they make a video for them…stuff like stuff like that. But but like for me I lived here so long I would not hit on New York."); *Id.* at 285 ("…I know I have lied to you but I'm not gonna tell you I'm the kind of person who would do these kinda attacks cause I'm not."); *Id.* at 290 ("But I honestly know that I wouldn't do that kinda stuff but I guess it's up to you guys to believe me I don't know….They they tried to convince you I say no…and that that's how it goes.").

sought to protect. "I know we will be judged by history, not just on how we disrupt and deter terrorism, but also on how we protect the civil liberties and the constitutional rights of all Americans, including those Americans who wish us ill,"[29] Mueller said. "We must do both of those things, and we must do them exceptionally well."[30]

A similar balancing act is before this Court at sentencing. On the one hand, Mr. Saleh has pled guilty to several serious crimes, and the Court must evaluate the nature of his conduct and the need for deterrence. On the other, it must consider Mr. Saleh not just as a terrorist, with all the ugly connotations that term brings to mind, but also as the person he was, the person he has become, and the person he might yet be. *See Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)) (the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."); *United States v. Singh,* 877 F.3d 107, 121 (2d Cir. 2017) ("While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of 'the diverse frailties of humankind.'") (citation omitted).

A sentence of incarceration is appropriate. But too lengthy a sentence will subvert the very purposes of 18 U.S.C. § 3553(a) and unnecessarily detain a young man who committed this crime as a teenager and has the will and capacity to change. *See* 18 U.S.C. § 3553(a) ("[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection.")

Several specific factors warrant the Court's leniency here.

---

[29] Robert S. Mueller, Stanford Law School, October 18, 2002, available at
https://archives.fbi.gov/archives/news/speeches/terrorism-in-a-post-9-11-world.
[30] *Id.*

### A.  Mr. Saleh Committed the Offense as a Teenager

First, Mr. Saleh was radicalized when he was just nineteen years old. The Supreme Court has repeatedly recognized that "children are constitutionally different from adults for purposes of sentencing." *Miller v. Alabama,* 132 S.Ct. 2455, 2464 (2012). According to the Court, there are "three significant gaps between juveniles and adults." *Id.* First, a "lack of maturity and an underdeveloped sense of responsibility" among young people, "lead[s] to recklessness, impulsivity, and heedless risk-taking." *Id.* (quoting *Roper v. Simmons,* 543 U.S. 551, 569 (2005)). Second, children "'are more vulnerable … to negative influence and outside pressures,' including from their family and peers." *Id.* (quoting *Roper,* 543 U.S. at 570). Third, a juvenile's traits are "less fixed" than an adult, and "his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'" *Id.* "[T]he signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Roper,* 543 U.S. at 570 (quoting *Johnson v. Texas,* 509 U.S. 350, 368 (1993)).

The Court's decisions rest "on science and social science." *Id.* In fact, differences in adolescent decision-making and risk assessment are partially attributable to discrepancies in the brain itself. The district court in *Gall v. United States* took note of scientific studies which "conclude that human brain development may not become complete until the age of twenty-five." *Gall v. United States*, 128 S.Ct. 586, 601 (2007) (citation and internal quotation marks omitted). Those studies show that there are two neurobiological systems underlying youth behavior: the prefrontal regulatory system, which is responsible for judgment and impulse

control, and the limbic system, which is responsible for emotional and reward-seeking

behavior.[31]

> During adolescence, the two systems are out of balance as limbic system activity
> increases while the prefrontal regulatory system lags behind. Pleasure-seeking and
> emotional reward responses develop more rapidly than does the system for self-control
> and self-regulation. Youths' impulsive behavior reflects a gut response rather than sober
> reflection. The presence of peers stimulates greater neural activity in the reward centers
> of the brain and further increases risk taking. The slower development of the PFC
> impulse-control system in relation to the limbic reward-seeking system likely contributes
> to youths' risk taking, poor judgment, and criminal involvement.[32]

The Supreme Court further recognizes that "the distinctive attributes of youth diminish

the penological justifications for imposing the harshest sentences on juvenile offenders, even

when they commit terrible crimes." *Miller,* 132 S.Ct. at 2465. *See also* Johnson, 509 U.S. at 367

(jury was free to consider a 19-year-old defendant's youth when evaluating future dangerousness

and stating that "'youth is more than a chronological fact. It is a time and condition of life when

a person may be most susceptible to influence and psychological damage.'") (quoting *Eddings v.

Oklahoma*, 455 U.S. 104, 115 (1982)). In other words, "youth matters" in determining an

appropriate sentence. *Miller,* 132 S.Ct. at 2465.

The "distinctive attributes of youth" are critical to understanding Mr. Saleh's offense

conduct. Like many ISIL recruits, Mr. Saleh was still living with his parents when he committed

this offense, and he was actively searching for meaning and direction. He felt marginalized by

his American peers and increasingly uncomfortable with life in the United States. ISIL offered

Mr. Saleh a pre-packaged identity and a sense of purpose and belonging. Indeed, its propaganda

machine specifically targeted disaffected young men just like him, angry over the killings of

---

[31] Barry C. Feld, *Adolescent Criminal Responsibility, Proportionality, and Sentencing Policy: Roper, Graham, Miller/Jackson, and the Youth Discount,* 31 Law & Ineq. 263, 286-87 (2013) (hereinafter Feld).
[32] Feld at 289-90.

innocent Muslims in the Middle East and discrimination against Muslims in the United States. Its strategy worked. As of August 2017, the U.S. government had brought 135 prosecutions related to ISIL.[33] More than half of defendants charged were twenty-five or under, and more than two-thirds were under thirty.[34]

Obviously, Mr. Saleh's decision to support ISIL was fraught with risk. But his adolescent mind was prone to underestimate the risk and prioritize the independence and personal fulfillment that ISIL offered. "I was advised by wise people," he writes, "including my parents and people at the mosque, but I was naïve, young, stubborn, and convinced about my ways." (Ex. A.) Mr. Saleh is now twenty-two, and his recklessness and impulsivity have subsided as he has grown older and more mature. He is chastened by his offense and eager to make amends. While at the MDC, he has "relearn[ed] [his] religion from scratch" and has been reading "all the books [he] can get on the mainstream correct teachings of Islam." (*Id.*) He has also met on various occasions with psychiatrist and retired U.S. Army Brigadier General Stephen Xenakis. Through his readings and conversations, Mr. Saleh has come to "appreciate th[e] wisdom" of his parents and others who advised him against pledging his support for the Islamic State. And he had come to understand "that when things go really bad in the world, take a step back, don't go out and seek the fight." (*Id.*) "I wish I had understood this better," he writes. "I understand it now." (*Id.*) When his sentence is complete, Mr. Saleh plans to continue his education and wants nothing more than "to please and help my parents who are growing older and weaker, and on whom this situation has taken the greatest toll." (*Id.*)

---

[33] *See* Karen J. Greenberg, *The American Exception: Terrorism Prosecutions in the United States – The ISIS Cases,* Center on National Security at Fordham Law School, at 3 (2017), available at https://static1.squarespace.com/static/55dc76f7e4b013c872183fea/t/59cf980ae45a7c855f673bca/1506777101200/The+American+Exception+9-17.pdf (hereinafter The American Exception).
[34] *Id.* at 11.

### B.  Mr. Saleh's Risk of Recidivism is Low

Second, Mr. Saleh's risk of recidivism is low.

Specific deterrence and protection of the public are obviously critical in a case such as this. Importantly, however, there is no generally-accepted, validated risk assessment model for terrorist cases. Nor is there any agreed upon profile for terrorism offenders. As Professor John Horgan writes, "[t]he journey into and out of terrorism is as personal as it is complex."[35] As with every criminal case, the Court is thus directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Gall,* 128 S.Ct. at 597.

To assist in this regard, we offer the report of Dr. Stephen Xenakis. Dr. Xenakis is board certified in General and Adolescent Psychiatry and has extensive experience in clinical psychiatry, research, teaching, and administration. He is also a retired Brigadier General in the U.S. Army where he served in various positions of responsibility as a clinician and commander. He has met with Mr. Saleh multiple times at the MDC, interviewed his family members, and reviewed extensive documentation and records in connection with the case.

Dr. Xenakis observes that Mr. Saleh has an average intelligence, no significant mental disorders, and no history of violence or aggressive conduct. (Ex. H at 5, 11.) On the contrary, he is consistently described as helpful, compassionate, and non-confrontational by family and friends. (*Id.* at 9.) Nor does Dr. Xenakis cite a single motivation or triggering event for Mr. Saleh's offense conduct. Rather, he identifies several factors underlying Mr. Saleh's radicalization process, including his youth, lack of direction and focus, desire for meaning, and inability "to reconcile his understanding of Muslim and Arab culture with the values and attitudes of Western democracy." (*Id.* at 8.)

---

[35] John Horgan, *What Makes A Terrorist Stop Being A Terrorist,* Journal of Deradicalization, Winter 2014, at 4.

When Dr. Xenakis first met Mr. Saleh in September 2015, Mr. Saleh continued to feel uncomfortable in Western society and remained captivated by the ISIL propaganda machine. In the two years since, Dr. Xenakis has witnessed a marked transformation in Mr. Saleh's ideas and perspectives. Dr. Xenakis notes that Mr. Saleh "has initiated a program of personal study of Islamic theology, politics, history, and the social sciences," and "has explored the contradictions between his basic values and self-perception as a non-violent and humanitarian and the threat and violence perpetrated by the Islamic State." (Ex. H at 8.) "He has expressed a deep appreciation that rash action and violent conduct violate the principles of faith to which he aspires." (*Id.* at 8.) He recognizes that he acted irrationally and that his plans were unrealistic and unsafe. (*Id.* at 7.)

Dr. Xenakis also explains that Mr. Saleh's "mental state has changed." (Ex. H at 10.) He has begun to "ag[e] out" of his adolescent beliefs. (*Id.* at 11.) "He does not express or demonstrate that he feels unsafe and threatened as he did at the time of the offenses." (*Id.* at 10.) Nor does he "express anger or hostility to[ward] the authorities or the United States government." (*Id.* at 9.) Rather he recognizes his wrongdoing and the severe burdens it has imposed on his family. (*Id.*) Dr. Xenakis concludes that Mr. Saleh is unlikely to "demonstrate the pattern of thinking that preceded his arrest and conviction" or to engage in additional offense conduct. (*Id.* at 11.)

Mr. Saleh has no prior criminal record. Further, but for one infraction involving a phone, he has not had any disciplinary problems in more than two years at the MDC. Most importantly, Mr. Saleh has the love and support of family and the intelligence and determination to remain on a law-abiding path. His parents look forward to welcoming him home when his sentence is complete, and his father hopes to open a deli where his family members can work together. (Ex.

E.) Mr. Saleh also intends to return to college, and he is of course willing to abide by any and all release conditions imposed, including intensive monitoring and mental health treatment.

### C.  A Sentence Significantly Below the Statutory Maximum is Necessary to Avoid Unwarranted Sentencing Disparities

Third, a sentence significantly below the statutory maximum is necessary to avoid unwarranted sentencing disparities among similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6). In August 2017, the Center on National Security at Fordham Law School released a report analyzing the ISIL-related cases prosecuted in federal courts between March 2014 and August 2017. The average sentence for defendants who pled guilty was 11.2 years, and the overall average sentence was 14.5 years.[36]

A full list of individuals who have been convicted of ISIL-related terrorism offenses is attached as Exhibit I, with the most relevant cases highlighted below. While each case is unique, the defendants discussed below all engaged in conduct similar to or more serious than Mr. Saleh. Their sentences varied widely. But even those individuals who were substantially more culpable than Mr. Saleh received sentences far below his statutory maximum.

### 1.  New York Cases

### a.  Akhror Saidakhmetov, Eastern District of New York, 15 Cr. 95

Mr. Saidakhmetov, 21, attempted to travel to Syria to fight for ISIL. He discussed his plans with a co-conspirator and reached out to a purported ISIL representative. If he was unable to reach Syria, Mr. Saidakhmetov planned to attack and kill law enforcement officers in the United States. He purchased a plane ticket to Turkey in February 2015, and was arrested at the airport attempting to board the flight. He pled guilty to one count of 18 U.S.C. § 2339B. On December 20, 2017, he was sentenced to 15 years' incarceration.

---

[36] The American Experience at 4. The average sentence for defendants who went to trial was 32.2 years. *Id.*

b.  Abdurasul Hasanovich Juraboev, Eastern District of New York, 15 Cr. 95

Mr. Juraboev, 25, planned to travel overseas to join ISIL. If he was unable to reach Syria, he planned to commit an act of martyrdom in the United States, such as killing the president or planting a bomb. He discussed his plan to join ISIL with co-conspirators, threatened online to kill President Obama, and purchased a plane ticket to Turkey. He was arrested at the airport before boarding the flight. Mr. Juraboev pled guilty to one count of 18 U.S.C. § 2339B. On October 27, 2017, he was sentenced to 15 years' incarceration.

c.  Emanuel Lutchman, Western District of New York, 16 Cr. 6071

Mr. Lutchman, 26, conspired with Abu Issa Al-Amriki, a now-deceased ISIL member in Syria, to conduct an attack in the United States on New Year's Eve in 2015. He obtained an online document with information on how to travel abroad, instructions for killing "non-believers," and contact information for Al-Amriki. Mr. Lutchman was in contact with three other individuals, all FBI informants, and together they took significant steps towards planning an attack. Mr. Lutchman identified a target, went to a store to purchase supplies, and made a video expressing support for the caliphate and announcing his intention to carry out the attack on New Year's Eve. He was then arrested. Mr. Lutchman pled guilty to one count of 18 U.S.C. § 2339B. On January 30, 2017, he was sentenced to 20 years' incarceration.

d.  Mufid Elfgeeh, Western District of New York, 14 Cr. 6147

Mr. Elfgeeh, 31, actively recruited and attempted to send two individuals, both FBI cooperators, to Syria to join ISIL. He sent propaganda videos to one of the individuals, arranged for an ISIL contact in Iraq to communicate with that person, and paid for the individual's travel documents. He also purchased electronics for both individuals to bring to Syria and coordinated their travel with an overseas contact. Mr. Elfgeeh further orchestrated the exchange of military support between local fighters in Syria in return for their allegiance to ISIL. He also used social media to express his support for ISIL and to solicit financial contributions to the terrorist organization. Mr. Elfgeeh pled guilty to two counts of 18 U.S.C. § 2339B. On March 17, 2016, he was sentenced to 22.5 years' incarceration.

2.  Cases Outside of New York

a.  Jalil Ibn Ameer Aziz, Central District of Pennsylvania, 15 Cr. 309

Mr. Aziz, 21, used his Twitter account to disseminate ISIL propaganda, assist people attempting to travel to fight for ISIL, and make threats against U.S. service members. He passed information between members of ISIL and those wishing to travel abroad to fight, including maps and telephone numbers. He also disseminated a "kill list," compiled by an ISIL member, containing names, addresses, and photos of service members and instructions to brutally murder them. A search of his backpack returned loaded, high-capacity magazines, a knife, and a mask typically worn by ISIL fighters. Mr. Aziz plead guilty to one count of 18 U.S.C. § 2339B, and one count of 18 U.S.C. § 875(c), transmitting a communication containing a threat to injure. On December 28, 2017, he was sentenced to 160 months' incarceration.

b.   Nicholas Rovinski, District of Massachusetts, 15 Cr. 10153

Mr. Rovinski, 27, conspired with his co-defendants, David Wright and Usaamah Rahmin, to behead a New York woman on behalf of ISIL. In June 2015, Rahmin and Wright decided instead to target local police officers, and Rahmin was subsequently killed while attempting to attack officers with a knife. Rovinski was arrested several days later. While incarcerated, he continued to conspire with Wright by writing letters to Wright discussing other potential attacks. Mr. Rovinski pled guilty to one count of 18 U.S.C. § 2339B, and one count of 18 U.S.C. § 2332b, acts of terrorism transcending national boundaries. On December 20, 2017, he was sentenced to 15 years' incarceration.

c.   Abdirizak Mohamed Warsame, District of Minnesota, 16 Cr. 37

Mr. Warsame, 20, participated in several meetings with a group of individuals who wished to travel to Syria to join ISIL. Mr. Warsame and his co-conspirators discussed funding for travel and the best routes from Minnesota to Syria to elude law enforcement. He applied for an expedited passport and gave a friend money to do the same. He also obtained the phone number of an ISIL fighter and gave the contact information to another friend planning to travel abroad. Mr. Warsame was a "leader" in his group. Mr. Warsame pled guilty to one count of 18 U.S.C. § 2339B. On November 14, 2016, he was sentenced to 30 months' incarceration.

d.   Avin Marsalis Brown, Eastern District of North Carolina, 14 Cr. 58

Mr. Brown, 21, contacted an undercover agent for help traveling overseas. They discussed the use of weapons, both abroad and in fighting "Kuffar" here in the United States. Mr. Brown also talked with his co-defendant, Mr. Jordan, about Mr. Jordan's AK-47 and how he would not hesitate to use it. Mr. Brown was arrested boarding a flight to Turkey. He later admitted that he planned to travel to Syria and to assist Mr. Jordan in entering the country. Mr. Brown pled guilty to one count of 18 U.S.C. § 2339A. On July 5, 2016, he was sentenced to 92 months' incarceration.

e.   Akba Jihad Jordan, Eastern District of North Carolina, 14 Cr. 58

Mr. Jordan, 22, and his co-defendant talked to undercover agents about their desire to travel overseas to join several terrorist organizations. They also discussed the use of weapons, both overseas and in the United States, and talked about Mr. Jordan's AK-47. After being arrested, Mr. Jordan admitted that he planned to travel to Syria, and a search warrant on his property returned the AK-47 and several other weapons. He pled guilty to one count of 18 U.S.C. § 2339A. On July 5, 2016, he was sentenced to 108 months' incarceration.

f.   Munir Abdulkader, Southern District of Ohio, 16 Cr. 19

Mr. Abdulkader, 22, planned to murder a specific employee of a military base at the employee's home and to videotape the murder so that it could be used as ISIL propaganda. Then he planned to attack a local police station. He also expressed his support for ISIL on social media, planned to travel to Syria, and was in contact Junaid Hussein. Hussein encouraged him to

execute the attack and sent him a "targeting package" about the intended victim. In preparation for the attack Mr. Abdulkader purchased an AK-47 and practiced shooting. He pled guilty to one count of 18 U.S.C. § 2339B, one count 18 U.S.C. § 1114, Conspiracy to Kill a Government Employee, and one count 18 U.S.C. 924(c), Possession of a Firearm in Furtherance of a Crime of Violence. On November 23, 2016, he was sentenced to 20 years' incarceration.

     g.  <u>Ardit Ferizi, Eastern District of Virginia, 16 Cr. 42</u>

Mr. Ferizi, 21, a hacker from Kosovo, gave ISIL members the personal data of more than 1,000 Americans. Mr. Ferizi was extradited to the United States in January 2016. He pled guilty to one count of 18 U.S.C. § 2339B and one count of 18 U.S.C. 1030(a)(2)(c), Unauthorized Computer Access and Obtaining Information. On September 23, 2016, Mr. Ferizi was sentenced to 20 years' incarceration.

     h.  <u>Jonas Edmonds, Northern District of Illinois, 15 Cr. 149</u>

Mr. Edmonds, 30, planned to help his cousin, Hasan Edmonds, travel overseas to join ISIL. After his cousin made it to the Middle East, Jonas planned to carry out an armed attack on the U.S. Army National Guard base in Illinois, using Hasan's military uniform as a disguise to get onto the base. Their plan also called for Hasan to provide a list of officers for Jonas to kill. Jonas plead guilty to one count of 18 U.S.C. § 2339B and one count of 18 U.S.C. § 1001(a)(2), False Statements Involving International Terrorism. On September 20, 2016, he was sentenced to 21 years' incarceration.

     i.  <u>Hasan Edmonds, Northern District of Illinois, 15 Cr. 149</u>

Mr. Edmonds, 23, a U.S. Army National Guard soldier, attempted to travel abroad to join ISIL. His cousin, Jonas Edmonds, drove him to an airport in Chicago, where he was arrested. The two also planned for Jonas to attack a U.S. military base after Hasan arrived overseas, and for Hasan to provide a list of officers for Jonas to kill. Hasan plead guilty to two counts of 18 U.S.C. § 2339B, and on September 20, 2016, he was sentenced to 30 years' incarceration.

     j.  <u>Christopher Cornell, Southern District of Ohio, 15 Cr. 12</u>

Mr. Cornell, 22, attempted to travel to Washington, D.C. to attack the capital during the State of the Union Address. He conducted online research for weapons, the construction of bombs, and potential targets in the D.C. area. He also possessed two semi-automatic rifles and ammunition. He pled guilty to one count of 18 U.S.C. § 1114, Attempted Murder of Government Employees and Officials; one count of 18 U.S.C. § 924 (c), Possession of Firearm in Furtherance of Attempted Crime of Violence; and one count of 18 U.S.C. § 2339B. On December 5, 2016, he was sentenced to 30 years' incarceration.

The cases cited by the government are inapposite. Six of the ten defendants who were

sentenced to life imprisonment were convicted after trial, and the four who pled guilty each

engaged in conduct significantly more serious than Mr. Saleh. Faisal Shahzad attempted to set

off a car bomb in Times Square. Mohammed Mansour Jabarah conspired with militants to bomb

U.S. Embassies in Singapore and the Philippines. Richard Reid brought explosives onto a

commercial aircraft. And Justin Sullivan agreed to a shooting attack, possessed a gun and

silencer, recruited an undercover FBI agent to kill his parents, and shot to death an elderly

neighbor. Mr. Saleh never purchased a gun or attempted to set off a bomb and, in fact, declined

an invitation to participate in a domestic terror attack.

The David Wright and Nicholas Rovinski conspiracy has some similarities to Mr. Saleh's

case, including the defendants' communication with Junaid Hussein. Unlike Mr. Saleh, however,

Mr. Wright and Mr. Rovinski continued to conspire following their arrest by writing letters

discussing other potential attacks. Moreover, they each received sentences far below Mr. Saleh's

statutory maximum. Mr. Wright, who was convicted after trial, received a sentence of twenty-

eight years. Mr. Rovinski, who pled guilty and cooperated, received a sentence of fifteen years.

In light of the above, a sentence of fifty-three years would be grossly disproportionate to

the sentences received by similarly situated defendants.

### D.  A Lengthy Sentence Will Not Promote General Deterrence

Finally, an unnecessarily lengthy sentence is unlikely to promote general deterrence.

Empirical research shows that, while *certainty* of punishment has a deterrent effect, "increases in

severity of punishment do not yield significant (if any) marginal deterrent effects."[37] The

---

[37] Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28-29 (2006). *See also* Sentencing Advisory Council, *Does Imprisonment Deter? A Review of the Evidence* at 14 (April 2011) ("'There is generally no significant association between perceptions of punishment levels and actual levels … implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms.'") (internal citation omitted); *see id.* at 15 ("the studies on changes to sentence severity do not imply that punishment does not generate any deterrent effect at all. Instead, the authors demonstrate that the deterrent effect does not increase or decrease according to the actual punishment level to any substantial degree."); Steven N.

government is more likely to achieve general deterrence through the widespread publication of Ms. Saleh's prosecution and conviction, which has already been achieved. Anyone with a television or access to the internet witnessed Mr. Saleh's arrest in June 2015 and the subsequent arrests of dozens more ISIL supporters across the country. Thus, all those considering a similar offense, but with the intelligence and wherewithal to resist such behavior, have already been deterred.

## V.

### THE TERRORISM ENHANCEMENT SHOULD NOT APPLY

The terrorism enhancement is the most severe of all sentencing enhancements. It increases both the offense level and criminal history category for defendants convicted of a felony "that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. Absent the enhancement, the advisory guidelines range for a standard material support case would be 63 to78 months (Base Offense Level 26, CHC I). With it, the advisory guidelines range is 360 months to Life (Base Offense Level 38, CHC VI).

The Court should reject application of the terrorism enhancement here. The Sentencing Commission did not develop the enhancement based on empirical evidence, and the use of Criminal History Category VI is entirely unwarranted for a young man (age 22) with no prior criminal record.

---

Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 30, 31 (Jan. 2011) ("These studies suggest that increases in severity of punishment have at best only a modest deterrent effect."); Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence,* 100 J. Crim. L. & Criminology 765, 817 (2010) ("[I]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity.")

### A.  The Terrorism Enhancement Was Not Developed Based on Empirical Evidence

The Supreme Court has held that the usefulness of a particular guideline depends on whether the Sentencing Commission acted in "the exercise of its characteristic institutional role" when it promulgated or amended the Guideline. *Kimbrough v. United States,* 552 U.S. 85, 109 (2007). The Commission's institutional role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and consultation with participants and experts in the criminal justice system. *Rita v. United States,* 551 U.S. 338, 348-50 (2007). Where a guideline is not developed based on "empirical data and national experience," a court may conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough,* 552 U.S. at 109-10.

The Second Circuit's holding in *United States v. Dorvee,* 616 F.3d 174 (2d Cir. 2010), is instructive. *Dorvee* addressed the automatic enhancements applied in child pornography cases under Guideline § 2G2.2, including for use of a computer and possession of multiple images. The Court noted that blind adherence to § 2G2.2 typically leads to guidelines ranges at or beyond the statutory maximum, even for first-time offenders, drawing "no distinction" between "the most dangerous offenders" and those with little or no criminal history. *Id.* at 187. It further stated that the concentration of offenders at or near the statutory maximum was "fundamentally incompatible with § 3553(a)." *Id.* The Circuit was particularly troubled that § 2G2.2 had been developed based on Congressional directive rather than empirical data. *Id.* at 186. While acknowledging the importance of federal prohibitions on child pornography, the Circuit cautioned district courts to exercise the "broad discretion they possess in fashioning sentences under § 2G2.2…bearing in mind that they are dealing with an eccentric Guideline of highly

30

unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.* at 188; *see also* 184 (§ 2G2.2 is "fundamentally different" from other guidelines and, unless it is "applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires.")

The concerns articulated by the Circuit in *Dorvee* apply with equal force here. The terrorism enhancement is the product of Congressional directive, not empirical data, and it is so broad as to apply in virtually every terrorism-related case. When Congress requested that the Sentencing Commission enact the terrorism enhancement in 1994, the Commission expressed hesitation because the proposed adjustment failed to account for defendants' personal history and characteristics, including that "defendants who share a common terrorist objective may vary greatly in terms of the threat to persons and national security that they realistically pose."[38] The Chair of the Attorney General's Subcommittee on Sentencing Guidelines disregarded this view and urged the Commission to enact the enhancement anyway "in order to combat this serious threat to public safety."[39] The basic premise was that individuals charged with terrorism-related offenses are highly ideological and, thus, uniquely incapable of being rehabilitated or deterred.[40]

---

[38] Sameer Ahmed, *Is History Repeating Itself? Sentencing Young Muslims in the War on Terror,* 126 Yale Law Journal 1520, 1535-56 (2017) (hereinafter Ahmed) (citing *Analysis of the Violent Crime Control and Law Enforcement Act of 1994: Part II,* U.S. Sent'g Comm'n 13 (1994)).

[39] Ahmed at 1536 (citing *Hearing Before the U.S. Sentencing Comm'n Concerning Proposed Sentencing Guidelines Amendments* 20 (Mar. 14, 1995) (statement of Jay P. McCloskey, U.S. Attorney, District of Maine & Chairman, Subcommittee on Sentencing Guidelines, Att'y Gen., Criminal Division)).

[40] Interestingly, a similar argument was used to justify legislation that led to disproportionately high sentences for African Americans in connection with the War on Drugs. The term used to illustrate the perceived threat posed by African Americans was "super-predator," coined by Princeton Political Science Professor John Dilulio to describe "black inner-city males," who were allegedly "hardened, remorseless juveniles" with "absolutely no respect for human life." Ahmed at 1554. Because of the assumed threat, the focus was not on rehabilitation but rather on lengthy punishment through mandatory minimum sentences. *Id.* at 1555. And, as Ahmed observes, "fears of young, African American super-predators unable to rehabilitate were

Though widely held,[41] this belief is unsupported by empirical fact. "[W]hen U.S.S.G. section 3A1.4 was adopted, the number of the anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline."[42] To this day, there remains practically no data on recidivism rates for defendants convicted of terrorism offenses.[43] But what little data is available suggests that terrorism defendants do not recidivate at higher rates than those convicted of other crimes.[44]

The assumption that terrorism offenders cannot be rehabilitated is also unsupported. Many countries facing extremist threats have established rehabilitation programs for convicted terrorists focused on mental health, education, family, economics, and social services.[45] In one Danish town, about 330 individuals have participated in a rehabilitation program, leading to a

---

inaccurate and overblown." *Id.* at 1556. "Many now have also recognized that the majority of individuals being sentenced in the War on Drugs were not violent, hardened criminals, but rather were capable of rehabilitation and reintegration into society." *Id.*

[41] When urging Congress to pass the USA Patriot Act, Attorney General John Ashcroft described terrorists as "savage," "freedom's enemies, murderers of innocents in the name of a barbarous cause," who are "undeterred by the threat of criminal sanctions." Ahmed at 1536-37 (citing *Expanding Terrorism, Investigation, Prosecution, Hearing Before the H. Comm. on the Judiciary,* 107th Cong. (2001) (statement of John Ashcroft, Att'y Gen. of the United States)). At the USA Patriot Act's signing ceremony, President George W. Bush added that the law "will help counter a threat like no other our nation has ever faced….They recognize no barrier of morality; they have no conscience. The terrorists cannot be reasoned with." *Bush Signs Anti-Terrorism Legislation,* Wash. Post. (Oct. 25, 2001)

[42] James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations,* 28 Law & Ineq., 51, 112 (2010).

[43] *Id.* at 114-15 (Noting the absence of statistical data demonstrating that defendants convicted of violating 18 U.S.C. §§ 2339B, 2339C, or other antiterrorism statutes are more likely to recidivate than other first offenders).

[44] *See* Scott Shane, *Beyond Guantanamo, a Web of Prisons for Terrorism Inmates,* N.Y. Times (Dec. 10, 2011) ("[I]t appears extraordinarily rare for the federal prison inmates with past terrorist ties to plot violence after their release. The government keeps a close eye on them: prison intelligence officers report regularly to the Justice Department on visitors, letters and phone calls of inmates linked to terrorism. Before the prisoners are freed, F.B.I. agents typically interview them, and probation officers track them for years.").

[45] *See* Ahmed at 1552 (countries with rehabilitation programs include Germany, Northern Ireland, Denmark, the United Kingdom, Jordan, Egypt, Singapore, Malaysia and others).

significant decrease in the number of young people joining ISIL, from 30 in 2013 to only one the following year.[46] There are no such rehabilitation programs in federal prisons in the United States.

The above analysis offers multiple reasons for disagreement with § 2G2.2. Should the Court decline to follow the guideline, it will be in good company. In 2014, 68.5% of defendants sentenced under § 2G2.2 received below-Guideline sentences.[47]

### B. Criminal History Category VI Substantially Over-Represents Mr. Saleh's Criminal History

A similarly inequitable outcome would result if the terrorism enhancement were applied to increase Mr. Saleh's criminal history category. Mr. Saleh has no prior arrests or convictions and has never served time in prison before. He should be in Criminal History Category I. But the terrorism enhancement places all terrorism offenders in Criminal History Category VI without regard to individual background. Criminal History Category VI is typically reserved for career offenders. Even armed-career criminals and repeat and dangerous sex offenders are not automatically placed in Criminal History Category VI. *See* U.S.S.G. § 4B1.4 (armed career criminals are category IV at minimum); § 4B1.5 (repeat and dangerous sex offenders are category V at minimum).

The placement of all terrorism defendants into Category VI undermines a basic principle of sentencing law: that punishment should be proportional to a defendant's personal history and characteristics. It is also "fundamentally at odds with the design of the Guidelines" because it

---

[46] *Id.* at 1553; *see also* Stefanie Mitchell, *Deradicalization: Using Triggers for the Development of a US Program,* 9 Journal for Deradicalization 101, 105 (Winter 2016/17) ("The recidivism rates claimed by deradicalization programs are unilaterally low, in particular when compared to national numbers from conventional penal systems.")

[47] *See* U.S. Sent'g Comm'n, *2014 Sourcebook of Federal Sentencing Statistics,* tbl.28.

"impute[s] to a defendant who has had no criminal history a fictional history of the highest level

of seriousness. It's one thing to adjust the offense level upward to signify the seriousness of the

offense. It is entirely another to say that a defendant has a history of criminal activity that he

does not, in fact, have."[48]

Guideline 4A1.3 permits horizontal downward departures where "reliable information

indicates that the defendant's criminal history category substantially over-represents the

seriousness of the defendant's criminal history or the likelihood that the defendant will commit

other crimes." U.S.S.G. § 4A1.3(b). Nothing in the text of Guideline § 4A1.3 restricts its

application in cases where § 3A1.4 is applied, and the Second Circuit has specifically recognized

a court's discretion to grant a horizontal departure following application of the terrorism

enhancement. *See United States v. Meskini,* 319 F.3d 88, 92 (2d Cir. 2003) ("[a] judge

determining that § 3A1.4(b) over-represents 'the seriousness of defendant's past criminal

conduct or the likelihood that defendant will commit other crimes' always has the discretion

under § 4A1.3 to depart downward in sentencing."). *See also United States v. Preacely,* 628 F.3d

72, 81 (2d Cir. 2010).

At least two courts have granted such departures. The defendant in *United States v. Aref*,

04 Cr 402 (Doc. 450) (N.D.N.Y.) (TJM), was convicted of ten counts, including conspiracy to

provide material support to a terrorist organization. The convictions arose from a protracted

conspiracy to fund terrorist organizations overseas and to import surface to air missiles into the

United States. *Id.* at 3. Despite the elaborate nature of the conspiracy, extensive planning, and

domestic aims, the court determined "that a criminal history category of VI does substantially

---

[48] George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts,* 23 Cornell Law Journal, 517, 539 (2014) (citing Transcript of Disposition at 69, *United States v. Mehanna*, No. 09-10017-GAO (D. Mass. 2012)).

over-represent the seriousness of [the defendant's] criminal history" and that criminal history category I was more appropriate: "Based upon [the defendant's] lack of prior criminal history, and his personal characteristics, the Court finds his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of I." *Id.* at 5-6.

The defendant in *United States v. Benkahla,* 501 F.Supp.2d 748 (E.D. Va. 2007), was convicted of two counts of false statements to a grand jury, obstruction of justice, and making false statements to an FBI agent after repeatedly denying having participated in terrorism training that included handling and discharging firearms or explosive devices. *Id.* at 750-51. The sentencing court addressed the disproportionate impact of the terrorism enhancement on the defendant's criminal history category: "For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." *Id.* at 759. The court further found that criminal history category VI over-represented the likelihood that Benkahla would commit other crimes and stated he was "the quintessential candidate for a downward departure under 4A1.3." *Id.* Accordingly, it reduced Benkahla's criminal history category to I.

Like Aref and Benkahla, Mr. Saleh is a strong candidate for departure under Guideline § 4A1.3. Since Mr. Saleh has no prior criminal record, Criminal History Category VI necessarily over-represents his criminal history. It also substantially over-represents his chance of recidivism. Individuals with no criminal record have the lowest rate of recidivism,[49] and there is no data to suggest that terrorism defendants recidivate at higher rates than other offenders. Moreover, for the reasons described above, Dr. Xenakis believes that Mr. Saleh is a low risk for

---

[49] *See, e.g., Recidivism and the "First Offender,"* U.S. Sent'g Comm'n at 26 (May 2004) (93.2% of first-time offenders did not recidivate).

repeat criminal conduct. Mr. Saleh has no history of violence or aggressive behavior, disavows ISIL, and stands ready to make amends.

## VI.

## THE TWENTY-YEAR STATUTORY MAXIMUM FOR COUNTS ONE AND TWO SHOULD NOT APPLY

Counts One and Two charge violations of the material support statute, 18 U.S.C. § 2339B. Prior to June 2015, the statutory maximum sentence for a violation of § 2339B was fifteen years. The statute was amended on June 2, 2015, to increase the maximum possible penalty to twenty years. *See* Subsec. (a)(1), Pub. L. 114-23 (substituting "20 years" for "15 years"). Mr. Saleh was arrested on June 13, 2015, just eleven days after the amendment went into effect, and the gravamen of his offense was committed before the effective date. Moreover, by the time of his arrest, the FBI had been monitoring Mr. Saleh for months and already could have charged him. In light of this, it would be both arbitrary and unfair to impose a penalty on Counts One and Two above fifteen years.

A sentence above fifteen years on Counts One and Two would also cause a disparity in sentencing between Mr. Saleh and co-conspirator Alaa Saadeh, who was prosecuted in the District of New Jersey. Mr. Saadeh was arrested on June 26, 2015—two weeks *after* Mr. Saleh—on a criminal complaint charging conspiracy and attempt to provide material support "from October 2014 to the present." Though his offense continued until late June 2015, the parties entered into a plea agreement stating that the conduct ended in May, thus ensuring application of the lower, fifteen-year maximum.

## VII.

## CONSECUTIVE SENTENCING IS INAPPROPRIATE

The PSR identifies Mr. Saleh's advisory guidelines range as Life and notes that, because no count of conviction carries a statutory maximum term of more than 20 years, the Court may impose consecutive sentences.

Guideline § 5G1.2(d) calls for consecutive sentences on multiple counts where necessary to reach the total punishment. However, sentencing courts retain discretion under 18 U.SC. § 3584 to sentence concurrently to achieve the goals of sentencing set forth in § 3553.

Where, as here, Counts One and Two describe the same criminal conduct, a consecutive sentence is inappropriate. The government's ability "to lengthen sentences in these circumstances simply by adding essentially duplicative counts, each describing the same criminal conduct, is a circumstance that was not adequately considered by the Sentencing Commission when it devised the formula for consecutive sentencing under § 5G1.2(d). It is therefore a permissible basis for downward departure" or variance pursuant to § 3553. *United States v. Rahman,* 189 F.3d 88, 157 (2d Cir. 1999).

## VIII.

## CONCLUSION

For the reasons stated, Ms. Saleh warrants a sentence significantly below the statutory maximum.

New York, N.Y.
January 23, 2018

Respectfully submitted,

/s/

Deborah Colson
COLSON LAW PLLC
80 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 257-6455