

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AAS/DMP
F. #2015R00096

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 31, 2018

By ECF

The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Munther Omar Saleh
     Criminal Docket No. 15-393 (MKB)

Dear Judge Brodie:

  The government respectfully submits this response to the sentencing submission of the defendant Munther Omar Saleh ("Def. Br."), which includes, among other materials, a letter from the defendant to the Court ("Def. Ltr.") and a psychiatric evaluation of the defendant ("Psych Report").

  In his submission, the defendant portrays himself as an adolescent who made several poor choices but in no way represented—or currently represents—a danger to the community. The defendant also generally argues that a sentence far below the statutory maximum of 53 years' imprisonment is warranted. As set forth below, the Court should reject these arguments, which are based on distorted readings of the record and without legal support.

  In particular, the government attaches hereto the expert opinion of Dr. Kostas A. Katsavdakis ("Katsavdakis Affidavit"), who opines that the psychological testing instruments utilized in the preparation of the Psych Report are not adequate to address the assessment of risk, threat, or recidivism. Accordingly, the government respectfully submits that the Psych Report does not meaningfully permit the Court to assess the danger that the defendant represents to the public, and that the Pysch Report should be disregarded as incomplete with respect to the defendant's likelihood of recidivism.

  The sentencing hearing in this matter is currently scheduled for February 6, 2018.

I.      Factual Background

In broad terms, the defendant minimizes his activities as a supporter of the Islamic State in Iraq and al-Sham ("ISIS") and the reasons he and co-conspirator Imran Rabbani rushed at an FBI surveillance vehicle (the "FBI Vehicle"), while armed with folding knives, on the morning of their arrests. As detailed in the government's original sentencing letter, the defendant's position is at direct odds with the evidence in the case and with reasonable interpretations of the defendant's own words and deeds. In this letter, the government responds to some of the more egregious factual characterizations in the defendant's submission as well as the defendant's legal arguments.

First, the defendant asserts that he became an ISIS supporter because of his interest in ISIS's purported message of a statehood opposed to violence, and that his pledge was a religious oath to Islam, and not to ISIS generally. (Def. Br. at 10-13). However, the defendant's social media postings from as early as 2014 indicate a radicalized mindset with an orientation towards violence. For example, on September 10, 2014, the defendant tweeted "i fear AQ [Al Qaida] could be getting too moderate."[1] In tweets from January and February 2015, the defendant expressed support for the Charlie Hebdo terrorist attacks in Paris, France, the immolation of Jordanian Air Force pilot Lt. Muath al-Kasasbeh by ISIS, the beheading of Japanese journalist Kenji Goto by ISIS, and the establishment of an ISIS military presence in New York City. (Saleh PSR ¶¶ 10, 12). These social media postings militate against any suggestion that the defendant's "goal was never to support a particular group, but to fulfill my obligation as a Muslim to help the oppressed." (Def. Ltr. at 1).

Second, the defendant asserts that he only began to "talk[] in a more aggressive way in my texts, mak[e] plans to leave, and discuss[] resisting law enforcement," including "f[inding] and contact[ing] an Islamic State recruiter by text," after he noticed that he was the subject of surveillance by members of law enforcement. (Def. Ltr. at 2). However, this characterization is inconsistent with the defendant's own social media postings from late 2014 and early 2015 summarized above, all of which took place at a time when he was not the subject of constant law enforcement surveillance. Additionally, two cooperating witnesses both have described the defendant as a fervent ISIS supporter who consistently sought to engage in violent acts either in the United States or abroad. For example, one cooperating witness has described the defendant's longstanding plan to earn money while fighting for ISIS abroad. Moreover, as described in the government's original sentencing letter, evidence recovered from the defendant's phone demonstrated that, from May 2015 until the time of his arrest, he received and followed repeated instructions from multiple ISIS attack facilitators located in Syria, including Junaid Hussain.

Third, the defendant claims not to have made any plans regarding travel to ISIS-controlled territories or an attack on U.S. law enforcement. (Def. Br. at 12). However,

---

[1]     All citations to electronic communications include original spelling, punctuation, and grammar.

as detailed in the government's original sentencing letter, the defendant and Rabbani both acquired hand knives in the days leading up to their attempted attack on the FBI Vehicle, at the same time that the defendant, Mumuni, and the other coconspirators were discussing conducting attacks on law enforcement as a way of supporting ISIS. Moreover, the defendant recruited and radicalized Mumuni, Rabbani, and the New Jersey coconspirators. Saleh later provided Mumuni with Junaid Hussain's guidance regarding the attack planning that gave Mumuni free reign to attack law enforcement; Saleh was fully cognizant that Mumuni might die in the process. Additionally, in his post-arrest statement, the defendant stated that he had not made immediate plans to travel because law enforcement authorities would likely foil any such efforts, and admitted that he could travel to Syria for less than $1,000. (Saleh Post-Arrest Tr. at 397). Finally, the fact that Saleh concealed from law enforcement in his post-arrest interview Mumuni's plans to attack law enforcement and the guidance from Junaid Hussain that Saleh had provided to Mumuni regarding such an attack demonstrates a desire to see that attack carried to completion without interruption from law enforcement, which is inconsistent with Saleh's claims in his sentencing submission that he lacked violent intent.

Fourth, the government disputes the defendant's claimed minimal involvement in arranging for Nader Saadeh's trip to ISIS-controlled territories through Jordan. Indeed, Saleh told law enforcement authorities in his post-arrest that Nader Saadeh would not have attempted to travel to join ISIS "if I didn't push him over man." (Saleh Post-Arrest Tr. at 468). A cooperating witness has confirmed that the defendant provided Nader Saadeh with the contact information for an individual known as "Khaled Al-Cambodi," who had access to a car or bus as well as identification documents that would permit Nader Saadeh to travel into Syria. In his post-arrest statement, the defendant confirmed that he was in contact with an ISIS facilitator known as "Cambodi" who was a "facilitator for travel" into Syria. (Saleh Post-Arrest Tr. at 309). Therefore, the contact for Al-Cambodi was not, as the defendant presently claims, "contact information, located online, for a purported ISIL recruiter." (Def. Br. at 14).

Fifth, the defendant claims in entirely conclusory manner that the government's description of his and Rabbani's attack on law enforcement is "a gross mischaracterization of the facts." (Def. Br. at 15). Notably, the defendant does not—and cannot—dispute the expert opinion of Harley Elmore, which describes the unique dangers posed by edged weapons, such as those used by Saleh, Rabbani, and Mumuni. Indeed, the defendant does not address the fact that Rabbani's knife contained a window-breaking tool, which would be useful for conducting a surprise attack on a law enforcement officer sitting in a surveillance vehicle.

Sixth, the government objects to the repeated suggestions by the defendant of purportedly coercive conduct by the government during the post-arrest statement. The government responded in detail to these claims in its opposition to Saleh's motion to suppress his post-arrest statements, but the Court's consideration of that motion was mooted by the defendant's guilty plea to the indictment. The government also objects to any consideration of the defendant's self-serving false exculpatory statements made during his

3

post-arrest statement, particularly in light of the fact that, during this interview, the defendant repeatedly minimized and lied about his own conduct and also actively concealed the clear and present danger presented by Mumuni to members of law enforcement.

    II.    <u>A Sentence of 53 Years' Imprisonment Is Warranted</u>

The defendant argues that a sentence far below the statutory maximum of 53 years' imprisonment is warranted by a variety of factual and legal arguments. For the reasons set forth below, the Court should reject these arguments, many of which are based on inapplicable case law or have been rejected in the Second Circuit.

<u>First</u>, the defendant misleadingly argues that leniency is warranted because the defendant committed the offense as a teenager, stating that he "was radicalized when he was just nineteen years old" and citing cases applicable to juveniles. (Def. Br. at 19). While the government has no objection to the Court considering the defendant's age and maturity as part of the Section 3553(a) factors, the defendant was not a juvenile or even a teenager when he committed his most disturbing conduct and, in any event, demonstrated leadership and maturity far beyond his years in planning and carrying out his crimes.

Saleh, who was born in 1995, turned 20 on May 11, 2015. Much of the offense conduct—including searching the Internet for bomb components, assault rifles and other weapons, and religious guidance on whether Islam permitted the killing of innocent people; obtaining a fatwa (or religious approval) for Mumuni to attack law enforcement and die in the process; and charging at law enforcement while armed with a knife—all took place when Saleh was 20 years old.

The cases on which Saleh relies concern juveniles. <u>See</u> <u>Miller v. Alabama</u>, 132 S. Ct. 2455 (2012) (precluding mandatory life sentences for juveniles who commit homicide crimes); <u>Roper v. Simmons</u>, 543 U.S. 551 (2005) (precluding the death penalty for juveniles). Notably, the Supreme Court explicitly restricted the applicability of these holdings to those under 18 at the time of their crimes, and did not preclude a sentence of life imprisonment or a lengthy term of years for a juvenile. <u>See</u> <u>Miller</u>, 132 S. Ct. at 2471 (noting that the Court's holding "does not categorically bar a penalty [life imprisonment] for a class of offenders [juveniles] . . . [i]nstead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty.").

Here, Saleh was not a juvenile at the time of his crimes, and his acts demonstrated a maturity level that exceeded his chronological age. Saleh stands in very different shoes than the two 14-year-old defendants who were sentenced in <u>Miller</u>. Saleh did not blindly follow orders or show any vulnerability to pressure from others. Rather, Saleh affirmatively encouraged Nader Saadeh and other co-conspirators to travel to Syria to join ISIS or, failing that, to work with him and Mumuni to conduct a terrorist attack; Saleh affirmatively requested that Junaid Hussain supply him with bomb-making instructions; and Saleh affirmatively sought out Junaid Hussain's religious permission for Mumuni to attack law enforcement and die in the process, before conveying to Mumuni that it was permissible

for him to do so. Indeed, in response to a request from Junaid Hussain to carry out an assassination in California or New York, Saleh declined to do so in favor of either traveling to Syria or conducting a bomb attack, which demonstrates Saleh's lack of vulnerability to pressure from others. Saleh's acts show that he was not behaving based on vulnerability to pressure from others or acting based on any lack of maturity. Saleh's acts belie any argument that his youth somehow mitigates his conduct or his culpability.

Second, the defendant argues that his risk of recidivism is low, based primarily on a psychological report from a clinical psychiatrist. (Def. Br. at 22-24). However, the report of the defendant's psychiatrist relies on psychological testing that is not specific to the threat assessment context. (See Psych Report at 5 (assessment using WAIS-IV, which is a standard measure of cognitive ability; MMPI-2RF, a standard test of personality and psychopathology; and a Rorschach inkblot test, which is a widely used personality assessment); Katsavdakis Affidavit ¶ 4). Contrary to the statement in the defendant's submission that "there is no generally-accepted, validated risk assessment model for terrorist cases" (Def. Br. at 22), there are in fact several widely-used tools for threat assessment (also referred to as "violence risk assessment") that have been developed or modified for specific use in the terrorism context.[2] As one paper on threat assessment tools reports, "[u]ntil recently, there was a total absence of decision support tools for individual assessment of risk for terrorist activity," but several such tools have now been developed "to assess and manage the risk posed by specific individuals within terrorism groups." Id. at 5-6. These tools include:

- The Violent Extremism Risk Assessment Protocol (VERA and VERA 2), developed in 2009 and updated in 2010, which focuses on terrorism motivated by extremist ideology, with a strong emphasis on extremism associated with radical Islam. Id. at 6-8.

- The Historical-Clinical-Risk Management-20 version three (HCR-20 V3), which is the "most widely used and best validated tool for individual assessment of risk for general violence." Id. at 16.

- The Multi-Level Guidelines, which applies the principles of HCR-20 V3 to group-based violence, including terrorist group-based violence. Id. at 8-11.

- The Extremism Risk Guidelines (ERG 22+), which focuses on the influences that drive people to engage in terrorism-related offenses,

---

[2] See, e.g., Hart, Cook, Pressman, Strang & Lim (June 2017), "A Concurrent Evaluation of Threat Assessment Tools for the Individual Assessment of Terrorism," Canadian Network for Research on Terrorism, Security, and Society Working Paper Series, available at http://tsas.ca/wp-content/uploads/2017/08/2017-01-Hart-WP.pdf (last accessed Jan. 30, 2018).

5

> and—like VERA 2—has a strong focus on extremism associated with radical Islam. Id. at 11-12.

See also Katsavdakis Affidavit ¶ 6.

Saleh was not assessed using any of these tools, or for that matter, any tools that relate to general violence or general criminality risk assessment. That significant omission renders incomplete the psychological analysis presented in connection with Saleh's assertion that he presents a low risk of recidivism. Indeed, as Dr. Katsavdikis opines, the Psych Report is fundamentally flawed, absent utilization of any "[p]sychological testing instruments [that] have been developed to assess risk, threat and recidivism in the violence, criminality and terrorism contexts." Katsavdakis Affidavit ¶ 6.

Third, although the defendant does not dispute the applicability of the terrorism enhancement set forth in Guidelines Section 3A1.4, the defendant – relying heavily on cases from the child pornography context – argues that the Court should decline to follow the terrorism enhancement because it is not based on "empirical data and national experience." (Def. Br. at 30-33).

In United States v. Meskini, the Second Circuit explained the rationale behind the terrorism enhancement under § 3A1.4:

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.

Meskini, 319 F.3d 88, 92 (2d Cir. 2003). Notably, the terrorism enhancement has been applied in numerous cases—including cases in this district—involving material support to terrorist organizations like Al Qaida and ISIS, and the government is unaware of any cases in this district where application of the terrorism enhancement has been rejected because it was not based on "empirical data or national experience." Judge Garaufis rejected this argument in United States v. Pugh, another case involving material support to ISIS. See United States v. Pugh, No. 15-CR-116, Docket Entry 157, Pugh Sentencing Mem., at 27-30 (raising this argument); Id., Docket Entry 166, Tr. of Pugh Sentencing, at 9 (rejecting the challenge to applicability of the terrorism enhancement); see also United States v. Mason, 410 Fed. Appx. 881, 886-87 (6th Cir. 2010) (rejecting defendant's argument that the district court should have declined to apply the terrorism enhancement because it was promulgated pursuant to congressional directive and not pursuant to empirical research).[3]

---

[3] For obvious reasons, there are not extensive studies of the rate of recidivism of terrorism defendants because the sentences for convicted terrorists are appropriately lengthy, so as to prevent any second opportunity to commit a terrorist act.

6

Fourth, the defendant argues that the application of the terrorism enhancement to increase the defendant's criminal history category from Category I to Category VI over-represents the defendant's criminal history and therefore the Court should grant a horizontal departure to a lower criminal history category. (Def. Br. at 33-36).

Under Guidelines Section 4A1.3(b), a sentencing court may grant a downward departure if "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b). The Guidelines themselves contemplate that this departure will be granted only in "limited circumstances." Id. comment.

When it comes to terrorism cases and the terrorism enhancement in particular, the Second Circuit has made clear enhancing a defendant's criminal history category to VI is appropriate:

> Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category [VI] for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation. . . .

Meskini, 319 F.3d at 92 (emphasis added). Thus, contrary to Saleh's argument (Def. Br. at 35), merely because a defendant has no prior criminal record does not mean that placing the defendant in criminal history category VI over-represents the seriousness of his criminal history or the likelihood that he will recidivate. Meskini makes clear that Congress has indicated its legislative intent through Section 3A1.4 to enhance a defendant's criminal history because terrorism offenses are more difficult to deter. Id. at 92. Thus, numerous courts have rejected horizontal departures in a defendant's criminal history category where a defendant with no prior criminal record was placed in criminal history category VI by operation of the terrorism enhancement. See, e.g., United States v. El-Hage, 589 Fed. Appx. 29, 31 n.2 (2d Cir. 2015) (finding no procedural error in district court placing defendant in criminal history category VI despite the defendant having no prior criminal convictions); United States v. Banol-Ramos, 516 Fed. Appx. 43, 46-47 (2d Cir. 2013) (no error district court's refusal to grant a downward departure because terrorism enhancement elevated criminal history category to VI); United States v. Hammoud, 483 Fed. Appx. 865, 873 (4th Cir. 2012) (affirming district court decision declining to modify criminal history category based on argument that it overrepresented the seriousness of defendant's criminal history because he had no prior criminal convictions); United States v. Lindh, 227 F. Supp. 2d 565, 571 (E.D. Va. 2002) ("Although the defendant has no prior criminal record, he is appropriately categorized in Criminal History Category VI, rather than I, pursuant to USSG § 3A1.4.").

7

Furthermore, the Second Circuit has also specifically held that any departures from the criminal history category should be made only in "exceptional cases." Specifically, the Second Circuit stated

> Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases.

Meskini, 319 F.3d at 92. While a sentencing court may downwardly depart in exceptional cases, this is not such a case. The only cases Saleh cites in support of such a horizontal departure are United States v. Benkahla, 501 F. Supp. 2d 748 (E.D.N.Y. 2007), and United States v. Aref, No. 04 Cr. 402, 2007 WL 804814 (N.D.N.Y. 2007). But those cases did not involve violent terrorist actors. In Benkahla, the defendant was convicted of neither a violent crime nor direct involvement in terrorist activity; rather, he was convicted of making false statements to a grand jury and obstructing justice in a federal criminal investigation of overseas terrorist groups. See 501 F. Supp. 2d at 751 ("Defendant's offenses neither directly 'involved' nor were 'intended to promote' a federal crime of terrorism." (emphasis in original)); see also id. at 759 (stating that the defendant "is not a terrorist"). The court departed from the terrorism enhancement guidelines because the court found the defendant did not have "the willful intent to promote an act of terrorism," and was "not the lynchpin in any organization or conspiracy being investigated." Id. at 760. Aref rose out of a law enforcement sting in which a confidential informant represented that he was importing a surface-to-air missile ("SAM") into the United States that it would be used by a terrorist organization. The defendant agreed to a money laundering scheme in which the informant would give the $50,000 proceeds from the importation of the SAM to the defendant who would, in turn, write $45,000 in checks to the informant's business and keep $5,000 for himself. United States v. Aref, No. 04 Cr. 402, 2007 WL 603508, at *2-*3 (N.D.N.Y. Feb. 22, 2007). The court granted a downward departure, finding exceptional circumstances, including the defendant's compelling personal characteristics and lack of prior criminal activity. Aref, 2007 WL 804814, at *3. Notably, in sentencing the defendant, the court also noted that there was no evidence that the defendant "actively sought out some way to aid a terrorist crime," but rather "the crimes were presented to him," and that the defendant "proceeded with the crimes out of greed—not an ideological desire to commit acts of terrorism." Id. at *7.

Here, in contrast, Saleh engaged in and promoted violent acts when he and another individual charged at a law enforcement officer with knives that they had acquired a week earlier for that purpose, when he obtained religious permission for Mumuni to attack law enforcement and die in the process, and when he planned a terrorist attack in the United States, all of which he did on behalf of and in support of ISIS. As a result, Saleh does not present anywhere near the "exceptional case" that warrants a downward departure from Criminal History Category VI.

8

Fifth, the defendant argues that the 20-year statutory maximum sentence applicable to Counts One and Two should not apply because the statutory maximum was increased from 15 years to 20 years eleven days before his arrest, and "the gravamen of his offense was committed before the effective date." (Def. Br. at 36). In fact, Saleh engaged in several significant acts as part of his conspiracy and attempt to provide material support to ISIS that took place after the June 2, 2015 effective date of the 20-year statutory maximum. Between June 2 and his arrest, Saleh communicated to Mumuni Junaid Hussain's religious permission for Mumuni to attack law enforcement and die in the process. Saleh also communicated with other ISIS attack facilitators during this period, including on June 3, 2015, when he advised an attack facilitator that three of his co-conspirators were planning to travel to Syria to join ISIS and a fourth was preparing to become a martyr in the United States. On June 9, 2015, Saleh asked that ISIS attack facilitator to assist in providing funding for the travel to Syria and if the facilitator could advise on how to travel while under law enforcement surveillance. And, finally, on June 13, 2015, Saleh charged at a law enforcement surveillance vehicle with a knife. During his change of plea hearing, Saleh was advised by the Court that the statutory maximum for Counts One and Two was 20 years. (Plea Tr. at 14). He then allocuted specifically to conduct that took place after June 2, 2015. Indeed, in a colloquy with the Court, the government explained that it was necessary for Saleh to allocute to the post-June 2, 2015 conduct in order to be subject to the 20-year statutory maximum, and Saleh then so allocuted. (Plea Tr. at 35-38). Accordingly, the 20-year statutory maximum sentence applies to Saleh's conduct with respect to Counts One and Two.

Saleh also argues that a sentence above 15 years on Counts One and Two would also create a sentencing disparity between Saleh and Alaa Saadeh, a New Jersey co-conspirator who was sentenced to 15 years. Crucially, however, such a disparity is not an "unwarranted" sentencing disparity. See 18 U.S.C. § 3553(a)(6). Saadeh is not similarly situated to Saleh because Saadeh did not engage in efforts to provide material support to ISIS after the June 2, 2015 effective date of the statute enlarging the penalty for a material support crime to 20 years. In a detailed 47-page complaint, the only conduct Saadeh is alleged to have engaged in after June 2, 2015 was to make several statements supportive of ISIS and to encourage another individual to lie to the FBI if the individual were questioned, for which conduct Saadeh was charged with witness tampering from June 13, 2015 through June 26, 2015. See United States v. Alaa Saadeh, No. 15-CR-558 (SDW), Docket Entry 1, Complaint, at ¶¶ 37-39 (June 26, 2015). Thus, the Information to which Saadeh pleaded guilty charged that he provided material support and resources to ISIS from October 2014 to May 21, 2015. See id., Docket Entry 15, Information (Oct. 29, 2015).

Sixth, the defendant argues that imposing consecutive sentences on Counts One and Two would be inappropriate because they describe the same criminal conduct. (Def. Br. at 37). Saleh is incorrect. Saleh's conviction on Count One is for the conspiracy to provide material support to ISIS—specifically, his agreement with the New Jersey conspirators to plan and coordinate their travel to Syria to join ISIS, his agreement with Junaid Hussain and others to conduct an attack in New York using a pressure cooker bomb, and his agreement with Mumuni and others to carry out an attack on law enforcement in the

9

United States. Conspiracy is, of course, a separate federal crime from an underlying offense. As Sand's Modern Federal Jury Instructions explains, "The crime of conspiracy to violate a federal law is an independent offense. It is separate and distinct from the actual violation of any specific federal laws." Sand, Modern Federal Jury Instructions, Instruction 19-2; see also Callanan v. United States, 364 U.S. 587, 593 (1961) ("It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses."). Saleh's conviction on Count Two is for the substantive offense of attempting to provide material support to ISIS, and the conduct underlying that conviction includes Saleh's efforts to assist Nader Saadeh in traveling to Jordan, where he intended to go to Syria to join ISIS, including by radicalizing Saadeh and pushing him to travel to join ISIS, going with Saadeh to purchase supplies, and providing Saadeh with contact information for an individual who could facilitate Saadeh's entry to ISIS, as well as Saleh's efforts to attack law enforcement and to conduct a pressure cooker bomb attack in New York. Notably, Saleh's efforts to conspire and attempt to provide material support was multifaceted, with a number of different means of providing material support and resources, including travel to Syria, waging an attack in the United States, and carrying out coordinated attacks on law enforcement. These could each have been charged as separate crimes. Thus, it is inaccurate for the defendant to argue that the government is charging essentially duplicative counts describing the same criminal conduct in Counts One and Two.

Moreover, it is well-settled under Second Circuit law that where the applicable Guidelines range of a defendant convicted of multiple counts of conviction exceeds the statutory maximum for the most serious offense of conviction, the district court should impose consecutive terms of imprisonment to the extent necessary to achieve the total punishment. See United States v. McLean, 287 F.3d 127, 136 (2d Cir. 2000); U.S.S.G. § 5G1.2(d). Here, of course, the defendant's Guidelines range is 53 years' imprisonment. Based on the four counts of conviction, each of which has a statutory maximum that is less than the applicable Guidelines range, the Guidelines themselves and the case law both support running the sentences on each count consecutively to reach the total punishment.

Finally, the defendant argues for a sentence "significantly below the statutory maximum," given the periods of incarceration imposed on other defendants who have been found guilty of similar conduct. In particular, the defendant argues that a lower sentence is necessary, in light of the nationwide average of 11.2 years' incarceration for defendants who plead guilty for ISIS-related activity. However, as described above and in the government's original sentencing letter, this case is not a typical case in which a person seeks to travel to ISIS-controlled territories, but rather an extreme case in that the defendant and others engaged in separate but coordinated ISIS-directed attacks on law enforcement that nearly caused the deaths of members of U.S. law enforcement as well as planned to commit a pressure-cooker bomb attack on American soil.

In arguing for a lower sentence, the defendant relies on numerous cases, most of which are from outside the Second Circuit, which involved less serious offense conduct and which often resulted in sentences cabined by the applicable statutory maximums. In

particular, few if any of the cases cited by the defense involve defendants who actually mobilized to commit violence as a demonstration of their support for ISIS, as is the case here. Notably, the only case from this district relied on by the defense (the Juraboev case) involves offense conduct that is not nearly as serious as the conduct in this case.

Several of the defendants whose sentences are relied upon the defense were cooperating witnesses who benefitted from sentencing leniency in return for their cooperation. These cases are United States v. Nicholas Rovinski, 15 Cr. 10153 (D. Mass.) (defendant cooperated with the government, testified at the trial of a co-conspirator, and was sentenced to 15 years' imprisonment pursuant to Rule 11(c)(1)(C)); United States v. Abdirizak Mohamed Warsame, 16 Cr. 37 (D. Minn.) (defendant was one of several cooperating witnesses in this case involving a group of individuals who sought to travel to Syria to join ISIS, testified at trial against three co-defendants, and was sentenced to 30 months' imprisonment in light of his cooperation); United States v. Avin Brown and Akba Jihad Jordan, 14 Cr. 58 (E.D. N. Car.) (both defendants cooperated with the government after being arrested after making plans to travel overseas to wage violent jihad, cooperated with the government, pleaded guilty pursuant to an Information charging one count of 18 U.S.C. § 2339B, and were sentenced to 92 months' and 108 months' imprisonment, respectively). Defendants who cooperate with the government are not similarly situated to Saleh, and those sentences are not relevant to the determination of Saleh's sentence. See, e.g., United States v. Ebbers, 458 F.3d 110, 129 (2d Cir. 2006) (sentencing disparities between defendant sentenced to 25 years' imprisonment and co-defendants who cooperated and were sentenced to between one and five years' imprisonment were reasonable).

Five other defendants whose sentences were cited by Saleh were involved in less serious conduct than Saleh and were sentenced to the applicable statutory maximum. These cases are:

- Abdurasul Hasanovich Juraboev and Akhror Saidakhmetov, 15 Cr. 95 (WFK) (E.D.N.Y.). Juraboev and Saidakhmetov were roommates who sought to travel to ISIS-controlled territories. Juraboev initially came to the attention of law enforcement authorities after he posted a social media message indicating that he would kill the U.S. President if authorized to do so by ISIS. When confronted by members of law enforcement, Juraboev readily admitted that he would act upon such an instruction, but had not received such a directive. Juraboev and Saidakhmetov were eventually apprehended: Saidakhmetov after he had attempted to board a flight to Turkey, and Juraboev after he had purchased a ticket for a flight to Turkey. While both individuals were in contact with purported ISIS personnel abroad, the discussions concerned possible travel routes into Syria, rather than attack plans in the United States. Both defendants were sentenced to the statutory maximum of 15 years. At the sentencing hearing of Saidakhmetov, the Honorable William F. Kuntz indicated that he would have imposed a much longer sentence if not constrained by the statutory maximum.

11

- Emanuel Lutchman, 16 Cr. 6071 (W.D.N.Y.). Lutchman was a Muslim convert with a history of mental health issues in contact with an ISIS attack facilitator; Lutchman agreed to conduct a New Year's Eve attack involving a machete and knives at a local restaurant. Lutchman was apprehended after he and an undercover officer purchased weapons and supplies for the attack at Walmart. Lutchman pleaded guilty to a one-count information charging him with a violation of 18 U.S.C. § 2339B, and was sentenced to the statutory maximum of 20 years.

- Hasan and Jonas Edmonds, 15 Cr. 149 (N.D. Ill.). Hasan Edmonds, a member of the Army National Guard of Illinois, engaged in online communications with an undercover officer in which he indicated that he and his cousin Jonas Edmonds wanted to travel to the Middle East to fight for ISIS. A second undercover officer discussed facilitating Hasan Edmonds's travel to the Middle East. Hasan Edmonds purchased a ticket to Cairo, Egypt, and informed an undercover officer of this development and that he intended to travel from Egypt to join ISIS. Jonas Edmonds informed an undercover officer that he intended to attack the Army National Guard base where his cousin worked. Both defendants performed surveillance on the base and discussed with an undercover officer their plan to obtain weapons. Both defendants were arrested after Hasan Edmonds attempted to board his flight to Egypt. Hasan Edmonds pleaded guilty to two violations of 18 U.S.C. § 2339B and was sentenced to the statutory maximum of 30 years. Jonas Edmonds pleaded guilty to one violation of 18 U.S.C. § 2339B and one violation of 18 U.S.C. § 1001 and was sentenced to 21 years.

The remaining sentences cited by Saleh were imposed in cases that bear little factual similarity to the instant matter, and therefore the sentences imposed in those cases have no bearing on the appropriate sentence for Saleh.

- Ardit Ferizi, 16 Cr. 42 (E.D. Va.). Ferizi, a Kosovar citizen and national, administered a website for ISIS videos. Ferizi hacked into a server, obtained personal identification information for 1,300 U.S. military and other government personnel, and provided this information to ISIS attack facilitator Junaid Husain, who disseminated this information on the Internet. After Ferizi was extradited from Malaysia, he pleaded guilty to one count of 18 U.S.C. § 2339B and one count of 18 U.S.C. § 1030, and was sentenced to 20 years—5 years less than the statutory maximum of 25 years if his sentences on both counts were to run consecutive.

12

- Christopher Cornell, 15 Cr. 12 (S.D. Ohio). Cornell was an ISIS supporter who decided to attack the capital during the President's State of the Union address. While accompanied by a confidential source, Cornell purchased two semi-automatic rifles and 600 rounds of ammunition before being arrested by law enforcement authorities. Cornell pleaded guilty to one count of 18 U.S.C. § 1114, one count of 18 U.S.C. § 924(c), and one count of 18 U.S.C. § 2339B. He was sentenced to 30 years pursuant to a Rule 11(c)(1)(C) plea.

- Mufid Elfgeeh, 14 Cr. 6147 (W.D.N.Y.). Elfgeeh attempted to recruit two individuals, both of whom were cooperating with the government, and another individual located overseas to travel to join ISIS. These efforts included finding an online ISIS contact for a prospective foreign fighter to discuss present conditions in Syria, paying for another prospective foreign fighter to obtain a birth certificate and passport, purchasing a laptop computer and high-definition cameras for use in Syria, and counseling the prospective foreign fighters on how to avoid detection by law enforcement and how to join ISIS. The defendant pleaded guilty to two counts of 18 U.S.C. § 2339B, and was sentenced to 22.5 years.

- Jalil Ibn Ameer Aziz, 15 Cr. 309 (M.D. Pa.). Aziz used social media to disseminate ISIS propaganda, including a "hit list" of American military personnel, and also served as a conduit between ISIS recruiters in Iraq and Syria and English-speaking recruits, providing supporters with contact information for the recruiters and advising supporters to travel covertly and what to bring when crossing the border into Syria. Aziz also prepared to fight by preparing a military-style backpack loaded with ammunition, a knife, and combat clothing. Aziz pleaded guilty to one count of 18 U.S.C. § 2339B and one count of 18 U.S.C. § 875(c). He was sentenced to 160 months' incarceration.

III.    Conclusion

        For all these reasons, and those set forth in the government's original sentencing memorandum, the government respectfully requests that the Court sentence Saleh to a term of imprisonment of 53 years in order to provide just punishment, protect the public, promote respect for the law, and provide adequate deterrence to others contemplating similar acts.

                                            Respectfully submitted,

                                           RICHARD P. DONOGHUE
                                           United States Attorney

                           By:    /s/Alexander A. Solomon
                                           Alexander A. Solomon
                                           Douglas M. Pravda
                                           Ian C. Richardson
                                           Assistant U.S. Attorneys
                                           (718) 254-7000

Enclosure

cc:    Clerk of the Court (MKB) (by ECF)
       Deborah Colson, Esq., counsel for defendant Saleh (by ECF)