

Colson Law PLLC

80 Broad Street, 19th Floor
New York, NY 10004

(212) 257-6455
www.colsonlaw.com

February 4, 2018

By ECF

Honorable Margo Brodie
United States District Court
225 Cadman Plaza East
Brooklyn, N.Y. 11201

  Re: *United States v. Munther Saleh,* 15 CR 393 (MB)

Dear Judge Brodie:

  In preparation for the sentencing hearing on February 6, 2018, attached please find:

1. A certificate from the Bureau of Prisons recognizing Mr. Saleh's completion of the Entrepreneurship Program at the MDC (Ex. A);

2. A letter from Barry Rosenfeld, Ph.D., discussing the various risk assessment tools identified by the government (Ex. B); and

3. Dr. Rosenfeld's curriculum vitae (Ex. C).

  Dr. Rosenfeld observes that "there is no published research" demonstrating the accuracy or utility of existing risk assessment tools in terrorism cases and "absolutely no evidence that the addition of any (or all) of these instruments improves the accuracy of clinical judgments." (Ex. A.) "Given the absence of any demonstrated validity" for the assessments, Dr. Rosenfeld concludes that the government's criticism of his methodology is "simply unfounded." (*Id.*) He further notes that the psychological tests he conducted on Mr. Saleh were intended to aid Dr. Xenakis' psychiatric assessment, which was also based on extensive clinical interviews, a review of available records, and collateral information. (*Id.*)

  Some additional observations regarding the government's January 31, 2018, letter follow below.

  The government suggests that Mr. Saleh had a "radicalized mindset" and violent orientation from the outset. (Gov. Ltr. At 2.) But Mr. Saleh's early tweets demonstrate his initial attraction to

Honorable Margo Brodie
Page 2

ISIL's message of statehood and citizenship. (Def. Bf. at 12.) Further, the government quotes Mr. Saleh's letter to the Court out of context. Mr. Saleh's mention of his desire to help the oppressed was not meant to minimize his subsequent criminal behavior. In fact, Mr. Saleh acknowledges a "change in approach," during which he "started talking in a more aggressive way in my texts, making plans to leave" etc. (Ex. A to Def. Br.)

The government also mischaracterizes Mr. Saleh's statements regarding his plans for a domestic attack. (Gov. Ltr. at 2-3). Mr. Saleh does not dispute his possession of a knife and acknowledges having texted Mr. Mumuni about an attack. But Mr. Saleh did not make concrete plans to carry out a domestic bombing. He did not purchase bomb-making materials or attempt to obtain or construct a bomb. Moreover, when approached, he declined to participate in a bomb attack altogether, informing the recruiter that his "firmness still needs work."

Nor, as the government asserts, did Mr. Saleh conceal from the arresting agents his discussion with Mr. Mumuni. (Gov. Ltr. at 3.) Mr. Saleh had a long, winding conversation with the agents over several hours. More than once during that conversation, he acknowledged having spoken about an attack with Mr. Mumuni. For example, when asked what they "would talk about doing," Mr. Saleh responded: "he's [Mr. Mumuni's] always being followed wherever he goes and they're all circling his house and that kinda stuff. He would wanna hit them or something." (Tr. at 239.)

Mr. Saleh acknowledges the dangers posed by "edged" weapons, i.e. knives, but continues to dispute the government's characterization of his conduct as a "potentially lethal knife attack." Mr. Saleh did not attack the agent with a knife, display a knife, or threaten its use. Moreover, even assuming Mr. Rabbani's knife contained a "window-breaking tool," Mr. Rabbani did not break or attempt to break a car window.

Mr. Saleh agrees that he committed some portion of the offense after turning twenty. But he did not instantaneously transform from teenager to adult upon his twentieth birthday. Various scientific studies "conclude that human brain development may not be complete until the age of twenty-five." *Gall v. United States,* 128 S.Ct. 586, 601 (2007) (citation and internal quotation marks omitted). And Dr. Xenakis believes that Mr. Saleh's "conduct over the years before his arrest is consistent with observations in emerging neuroscience on the state of mind of adolescents and adults." (Ex. H to Def.

Honorable Margo Brodie
Page 3

Br. at 9.) In fact, Dr. Xenakis describes in detail Mr. Saleh's immature and flawed thinking at the time of his offense, including Mr. Saleh's: (1) "fail[ure] to appreciate the alarm and personal threat that his activities and conversations placed on him and his friends," (2) inability to adjust his lifestyle, and (3) unrealistic and inappropriate plans for protecting himself. (*Id.* at 8.)

The government advocates application of the terrorism enhancement and use of Criminal History Category VI in part because of a supposed greater risk of recidivism among terrorism defendants. (Gov. Ltr. at 6-7, quoting *United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003)). At the same time, however, the government acknowledges the dearth of recidivism research for terrorism cases. (*Id.* at 6, n. 3.) This lack of empirical evidence provides a sound basis for declining to apply the terrorism enhancement here. *Kimbrough v. United States,* 552 U.S. 85, 109-110 (2007) (sentencing court may disagree with a guideline that is not developed based on "empirical data and national experience.")

Finally, while the Court may impose consecutive sentences, the Guidelines are, of course, discretionary, and the Court has the power to sentence concurrently to achieve the goals of 18 U.S.C. § 3553. Counts One and Two address the same course of criminal conduct, and even the government's description reveals a significant overlap in offense activity. (Gov. Ltr. at 9-10.)

Respectfully submitted,

/s/

Deborah Colson
(212) 257-6452

cc:   AUSA Alex Solomon
        AUSA Doug Pravda
        AUSA Ian Richardson

Enclosure

24241